Sidney **DIGGS, IV, Plaintiff–Appellee,**

v.

**PEPSI–COLA METROPOLITAN BOTTLING CO., INC., Defendant–Appellant.**

No. 86–1480.

United States Court of Appeals, Sixth Circuit.

Argued July 31, 1987.

Decided Nov. 15, 1988.

Rehearing and Rehearing En Banc Denied Jan. 26, 1989.

James M. Gecker, Ross & Hardies, Richard E. Lieberman (argued), Margaret M. Fiorenza, Chicago, Ill., for defendant-appellant.

M.T. Thompson, Jr. (argued), Saginaw, Mich., for plaintiff-appellee.

Before ENGEL, Chief Judge,* and MERRITT and KRUPANSKY, Circuit Judges.

ENGEL, Chief Judge.

Pepsi–Cola Metropolitan Bottling Co., Inc. appeals a judgment entered against it after a bench trial in the United States District Court for the Eastern District of Michigan on plaintiff's wrongful discharge claim under *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980). This appeal raises important issues concerning both the application of *Toussaint* where the finder of fact (here the trial judge) finds a promise not to discharge without just cause and the award of front pay in such cases.

Sidney Diggs, IV was a district sales manager for Pepsi–Cola Metropolitan Bottling Company, Inc. from 1977 until his discharge on September 23, 1983. During this time, he was subject to a formal writ-

---

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

ten evaluation each year that included a graded performance evaluation. The possible grades, from highest to lowest, were: distinguished, superior, commendable, fair and marginal. In 1978, after Diggs had learned about the termination of another district sales manager, he asked his supervisor, Mr. Haslam, about the company's policy on job security. The testimony is disputed as to the response. Diggs claims that he was told that "as long as your performance is satisfactory, you won't have to worry about [termination]." Pepsi–Cola claims that Diggs was told that his job was secure as long as he continued to receive a performance rating of commendable or above.

Diggs was terminated after Pepsi–Cola received customer complaints regarding his performance. His last two evaluations had been a "commendable" minus and a "fair," both below Pepsi–Cola's alleged performance requirements. Diggs disputes the objectivity of these evaluations.

Diggs brought a six-count complaint in the circuit court for Saginaw County, Michigan, which Pepsi–Cola removed on diversity grounds to the United States District Court for the Eastern District of Michigan. Diggs' complaint challenged his discharge and denial of promotion opportunities on theories of race discrimination, breach of an implied employment contract, negligence, promissory estoppel, and unjust enrichment. After the district court granted summary judgment to defendant on all counts except race discrimination and breach of contract, the case proceeded to trial on the latter two issues. The district judge held for Pepsi–Cola on the race discrimination claim, but entered a judgment for Diggs on the *Toussaint* claim. The district judge awarded Diggs $36,167 in back pay, $133,483 in front pay and $48,124 in prejudgment interest, for a total of $217,774.

The district judge found that representations made by Diggs's supervisor regarding job security created a "just cause" termination contract within the meaning of *Toussaint*. He also found that a term of the contract provided that the plaintiff would be evaluated by defendant in a fair and objective manner. The judge concluded that this contract had been breached when Diggs was discharged without good cause and before an objective evaluation had been made of his performance. He held that the contract had been breached because the defendant bore the burden of proving just cause, and no evidence was provided regarding whether the plaintiff was performing satisfactorily at the time of discharge. The district judge was not persuaded by defendant's testimony regarding Diggs's ability to mitigate his losses, and therefore awarded front pay, which was discounted to its present value as of the date of judgment at a rate of 5%, while prejudgment interest was assessed from the date of the filing of the complaint at a rate of 12%. Pepsi–Cola filed a motion to alter or amend the judgment, which was denied. This appeal followed.

On appeal, Pepsi–Cola argues that the district court erred in (1) finding that the employment contract permitted only just cause dismissal under *Toussaint;* (2) placing upon it the burden of proof on the existence of just cause; (3) ruling that the customer complaints did not constitute just cause; (4) awarding front pay; and (5) improperly calculating the discount rates for the damage award.

## I.

■■■ The trial judge's initial task was to determine what promise had been made to Diggs. In his supplemental findings of fact and conclusions of law he states: ·

Keith Haslam, as regional sales manager, promised the plaintiff that he would retain his position as district sales manager as long as his performance was maintained at a certain level. It is uncertain whether the promise was couched in terms of satisfactory performance, credible performance, or commendable performance, but it does not matter because, for all purposes relevant to the suit, the words are synonymous. Furthermore, it may fairly be inferred that the promise to him included a promise that the evaluation would be fairly and

objectively determined in accordance with the practices of the defendant.

This statement reiterates and clarifies the more protracted remarks that the district judge made from the bench. The finding indicates that he found that Haslam promised Diggs that Diggs would not be fired so long as his performance was satisfactory. Satisfactory was found to mean receiving a rating of "commendable" or better on his Pepsi–Cola employee evaluation. However, the judge found that there was also an implicit duty on the part of Pepsi–Cola to make the rating determinations objectively and fairly. These findings represent a compromise between Diggs's claim that the promise was made independent of any performance criteria and Pepsi–Cola's claim that the only promise made was to employ Diggs so long as *it* determined that his performance appraisals were adequate. Our review of the record indicates that these findings were not clearly erroneous.

Pepsi–Cola argues that it was error for the district court to conclude that the agreement that it reached with Diggs included a just cause contract under *Toussaint*. It claims that *Toussaint* specifically excludes situations where a promise to employ is predicated on an employer's performance appraisal system. Pepsi–Cola cites several cases for the proposition that a nexus between a performance appraisal plan and job retention decisions cannot form the basis for a *Toussaint* just cause contract. However, this authority is not persuasive.

*Dzierwa v. Michigan Oil Co.*, No. 84–34558–Ck, slip op. (Cir.Ct., Jackson City, Mich. May 22, 1985), *aff'd* 152 Mich.App. 281, 393 N.W.2d 610 (1986), did not involve a specific promise by an employer to alter a terminable-at-will employment contract. Instead, in *Dzierwa*, the employee was offered benefits, told that the company expected him to remain for a long time and told that ratings of "marginal" or "unsatisfactory" for two consecutive years would lead to his dismissal. *Dzierwa*, slip op. at 3.

Similarly, in *Kay v. United Technologies Corp.*, 757 F.2d 100 (6th Cir.1985), we re-fused to find a *Toussaint* contract when plaintiff's evidence consisted of: a letter to him from the president of the company stating that "[m]aximum effort ... is the surest way we can contribute to ... our own job security."; an employee appraisal program; and deposition testimony stating that the evaluations were undertaken not for job security but to improve employee performance. *Kay*, 757 F.2d at 101–02.

*Rouse v. Pepsi–Cola Metropolitan Bottling Co.*, 642 F.Supp. 34 (E.D.Mich.1985) and *Copeland v. Pepsi–Cola Metropolitan Bottling Co.*, No. 84–CV–1180–DT, slip op. (E.D.Mich. April 17, 1985), are also cited by Pepsi–Cola as evidence that the performance evaluation plan in question here has previously been found to be an insufficient basis for finding a *Toussaint* contract. However, Pepsi–Cola fails to point out the fact that in *Rouse* the plaintiff attempted to rely on the evaluation program without any other evidence of a contractual promise of continued employment. Also, in *Copeland*, the only evidence in addition to the plan was a promise that the plaintiff had a "future" with the company. Pepsi–Cola's reliance upon *Rouse* and *Copeland* is unpersuasive. This litigation involves an oral promise that is tied to a performance evaluation system. This is quite different therefore from cases based merely upon the presence of an evaluation system or from cases where an oral agreement was not reliably established as a matter of fact.

Pepsi–Cola also asserts that the district court's faithfulness to the *Toussaint* decision was misplaced, in light of the generally narrow construction that recent courts have given to *Toussaint*, calling particular attention to our recent decision in *Grant v. Rockwell International Corp.*, 811 F.2d 605 (6th Cir.1986). Pepsi–Cola claims more from that decision than its language will support. The result in *Grant* turned upon the absence of a clearly credible and established promise enforceable under *Toussaint*. Essentially, *Grant* holds that such a promise may not be inferred merely from an employer's establishment of a grievance procedure, or from the creation of probationary status.

In *Carpenter v. American Excelsior Co.*, 650 F.Supp. 933 (E.D.Mich.1987), plaintiff testified that he was told that he could work for the company as long as he performed "properly." He then signed an employment application which included a clause stating that he knew he could be terminated at the will of his employer. The court found that the promise to allow him to continue if he performed properly gave him a " 'mere subjective expectancy' that he would be terminated only for just cause." *Id.* at 936. The court concluded that to expand *Toussaint* by relying upon such vague statements without further supporting evidence, would virtually swallow up the employment-at-will doctrine. Here the district judge, as trier of fact, was faced with a specific promise coupled with a performance standard. Unlike Carpenter, Diggs did not sign an "employment-at-will" clause.

Pepsi–Cola also relies on *Valentine v. General American Credit, Inc.*, 420 Mich. 256, 362 N.W.2d 628 (1985). In *Valentine*, Judge Levin, the author of *Toussaint*, announced that "[Toussaint] did not recognize employment as a fundamental right or create a new 'special' right. The only right held in *Toussaint* was the right that arose out of the promise not to terminate except for cause." *Id.* at 258, 362 N.W.2d at 629. Since the district court found that such a promise was made to Diggs, the limitations of *Valentine* would not seem to matter here. In summary, we find little persuasive precedent for the argument that *Toussaint* should not be applied to these facts.

Having said this much, we are nonetheless bound to observe that as a matter of direct precedent, the only authority that Diggs can cite is *Toussaint* and its companion case, *Ebling v. Masco Corp.*, 408 Mich. 578, 292 N.W.2d 880 (1980). Further, *Toussaint* does not expressly address whether a promise to employ as long as one measures up to performance criteria gives rise to an implied contract to the same effect.

Our affirmance of liability does not expand *Toussaint.* A promise to Diggs that he would not be discharged unless his performance was below par was factually established. That the promise did not include the magic words "just cause" is not sufficient to justify excluding the case from *Toussaint* coverage. Further, *Toussaint* clearly holds that the existence of a just cause promise is a question of fact. 408 Mich. at 598, 292 N.W.2d at 885. Under Fed.R.Civ.P. 52(a) we are limited in our review to whether the trial judge's finding in this regard was clearly erroneous. Plainly it was not.

Judge Krupansky, in his dissent, urges strongly that under these facts, Diggs has made out only a "satisfaction" contract. However, the experienced Michigan trial judge who tried the case without a jury did not so conclude. Viewing the testimony most favorably to Diggs, as we must, it was, in our judgment, an appropriate exercise of discretion for the trial judge to conclude that the language was that of an implied promise not to discharge except for just cause.

Judge Churchill could reasonably have concluded that Diggs's express concern that Pepsi–Cola "could come in and arbitrarily dismiss us for no apparent reason" coupled with the regional sales manager's direct response to his inquiry about job security, allaying such concern, were enough to establish a just cause contract. That we, sitting in review, might have reached a contrary conclusion is not a sufficient basis for reversal, simply because the case was tried before a judge and not a jury.

Judge Krupansky would argue that Diggs's allegations must amount to a satisfaction contract as a matter of law. He claims that we have disregarded the entire line of Michigan satisfaction contract cases. We disagree. Instead, we have noted that the instant case, unlike the cases relied upon by Judge Krupansky and the appellant, does not fall easily into the satisfaction contract category. Here, the term "satisfactory" is given additional meaning by virtue of the fact that, in the view of the trial judge, it was made with reference to Pepsi–Cola's performance appraisal sys-

tem. We agree with Judge Krupansky that an appraisal system, standing alone, is insufficient to create a just cause contract. However, the fact that the promise to retain Diggs's services as long as he performed satisfactorily was coupled with the appraisal system raises the possibility that the employer waived the right to discharge Diggs at will.

Moreover, we find the facts of this case to be very similar to those presented in *Ebling, supra.* In *Ebling,* the plaintiff was told that he would not be dismissed if he was "doing the job." *Id.* at 597, 292 N.W.2d at 884. The court found that promise sufficient to permit a jury to find a just cause contract. *Id.* at 598, 292 N.W.2d at 885. They further found that the facts of *Ebling* were "not factually distinguishable" from those in *Toussaint,* where a primary policy manual statement that employees would only be discharged for good cause was found to form the basis for a just cause contract. *Id.* at 597, 292 N.W.2d at 884.

We do not see any basis for distinguishing between a promise to employ if one is "doing his job" and a promise to employ if one's performance is satisfactory. *Toussaint* and *Ebling* imply that the trier of fact has the duty to determine whether an employer's promise, oral or written, amounts to more than a mere satisfaction contract. This determination depends upon the specific factual context and the credibility of the parties. As such, we believe that

it was within the district judge's discretion to draw this conclusion.

## II.

Pepsi–Cola claims that the trial judge erred in holding that it and not Diggs had the burden of proof on the issue of whether Diggs was dismissed for just cause. The district judge here relied upon *Rasch v. City of East Jordan,* 141 Mich. App. 336, 367 N.W.2d 856 (1985), for the proposition that if Diggs can make out a prima facie case of a *Toussaint* violation, "the defendant then has the affirmative of proving that plaintiff has breached the contract, and that the discharge was legal." *Id.* at 340, 367 N.W.2d at 858. In *Rasch,* the Michigan Court of Appeals set out what it considered to be the requirements of a prima facie case: (1) a just cause contract; (2) performance by the employee until discharge; and (3) damages. *Id.* Finding that Diggs had met all of these requirements, the district judge shifted the burden of proving just cause for dismissal to Pepsi–Cola. Since the judge found that neither side had succeeded in proving just cause or the lack thereof, he held that Diggs's dismissal was not for just cause.

Pepsi–Cola argues that it was error for the trial judge to saddle it with the burden of proving that it had dismissed Diggs for just cause. It asserts that the trial judge's finding that Diggs "continued to try to do his best on the job" was inadequate to meet Diggs' burden of showing his own performance of the contract.[1] Pepsi–Cola then

---

1. The district court, in its supplemental findings of fact and conclusions of law, expanded upon its earlier statement on this issue, holding that:

   The evidence with respect to the issue of performance is conflicting. The plaintiff has not proven that a fair objective evaluation of his actual performance would have been better than substandard. Neither has the defendant proven that it would have been substandard. The complaints from the defendant's customers were a legitimate concern to the defendant. It is by no means clear, however, that the plaintiff's performance justified the complaints. His satisfactory or better performance for several years taken together with the fact that his performance had earned him an offer of promotion to regional sales manager in Coldwater weighs in his favor. The defendant has the burden of proof on this

issue. *See Rasch v. City of East Jordan,* 141 Mich.App. 336, 340 [367 N.W.2d 856] (1985). It has failed to meet this burden.

The district judge also noted that Diggs continued to work until his dismissal. He stated that Diggs "has shown performance in the sense that he continued to work. He didn't miss work."

Judge Krupansky's dissent discusses Diggs's misdeeds and poor evaluations at some length. Thus, we feel compelled to point out that there is also considerable evidence that indicates that Diggs was performing satisfactorily at the time of his discharge. Diggs received praise in his evaluations for 1982 and 1983 written by Brian Beattie, his regional sales manager. In 1982, Beattie stated that Diggs "ha[s] a good understanding of the business." He also noted, with approval, that Diggs had secured 26 new accounts. In his 1983 evaluation, Beattie com-

cites cases which it claims support the proposition that "an employee must first establish his own full performance under the contract before the burden shifts to the employer to justify the discharge." This we believe is correct. It does not, however, mean that the claim must be uncontroverted.

Pepsi–Cola first cites *Zdero v. Briggs Mfg. Co.*, 338 Mich. 549, 61 N.W.2d 615 (1953), as authority that under Michigan law the plaintiff must, as a part of his case in chief, present clear and convincing evidence that he had fully performed his part of an employment contract. We can only observe that *Zdero*, which predates *Toussaint* by many years, was not an attempt to define the requirements for making out a prima facie cause of action for unlawful discharge, but rather was an action in equity for specific performance of an employment contract.

Pepsi–Cola also relies on the even older *Saari v. George C. Dates & Assoc.*, 311 Mich. 624, 19 N.W.2d 121 (1945), for the proposition that an employee must prove his own performance in making out a prima facie case for wrongful termination. While this decision did concern what was necessary to make out such a prima facie case, it is not clear that the requirements are as Pepsi–Cola describes them. When summarizing what the plaintiff had proved, the *Saari* court did say that he had "performed his contract up to the time of his discharge." *Id.* at 628, 19 N.W.2d at 123. However, when setting down the actual standard, the court stated: "On the record before us the plaintiff made a prima facie case by proving the contract, *testimony* that he had performed it up to the time of his discharge, and proof of damages." *Id.* (emphasis added). Thus, it appears that

the *Saari* court may only require evidence of compliance as opposed to proof of it. There is no question that Diggs supplied some evidence of compliance in his trial. It is less certain that he *proved* compliance.

Finally, Pepsi–Cola argues that the district judge misinterpreted the holding of *Rasch*. It cites to language in *Rasch* that "[t]he burden of proof is upon plaintiff to prove his contract and its performance up to the time of discharge." 141 Mich.App. at 340, 367 N.W.2d at 858. However, the *Rasch* court, like the *Saari* court, gives two standards for a prima facie case. In addition to the one relied on by Pepsi–Cola it also cites *Saari* and says that a plaintiff need only "produce[ ] testimony that he had performed [the contract] up to the time of his discharge." *Id.*

Michigan authority on this point of law is not entirely clear as to the quantum of proof required for a prima facie case. However, we are satisfied that remand to gain a clearer insight would not alter the result here. Given the fact-finding powers vested in the trial judge and our respect for his closer familiarity with the nuances of the law of the state in which he sits, we are not disposed to disturb this aspect of his decision.

### III.

■ Pepsi–Cola argues that the district court was bound as a matter of law to uphold its determination that customer complaints lodged against Diggs provided just cause for his discharge as a matter of law. It contends that any other holding, in effect, relegates essential employment decisions to the courts, not to the employer charged with such responsibilities. It is

---

mended Diggs for display performance, gaining new shelf space at some retail outlets, establishing new vending machines and keeping his records up to date.

Further, Diggs received a letter in July of 1983 from Fred Gambrell, a Pepsi–Cola marketing analyst for Michigan, whom Diggs described as the "right hand man" of Pepsi–Cola Division Vice President Ken Yoder. He encouraged Diggs, stating "Sydney, it was a pleasure meeting you; and after looking at your trade, I can see you are going to make things happen. Keep

it going." Diggs also testified that, in addition to the promotion offer that the court took note of above, he was recommended for a position with Pepsi–Cola as a marketing analyst. Finally, Diggs testified that Beattie had told him that he had rated Diggs lower on his 1982 evaluation than he should have because he was just getting to know Diggs when he wrote it. Thus, we believe that there were sufficient facts for the district judge to find that Pepsi–Cola failed to meet its burden of establishing just cause for Diggs's discharge.

indeed true that the trial court accepted the fact that the complaints actually occurred and that they were serious in nature. Thus, Pepsi–Cola argues that anything other than a finding of good cause was an impermissible interference with its business judgment.

Pepsi–Cola states that "the Michigan Supreme Court has provided little guidance on the meaning of just cause...." The answer to this claim lies in the language of *Toussaint* itself. The court stated "[A] promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge." *Toussaint,* 408 Mich. at 621, 292 N.W.2d at 895. The court went on to say that "the jury should ... decide whether the reason for discharge amounts to good cause." *Id.* at 623, 292 N.W.2d at 896. The Michigan Supreme Court recently reaffirmed this position in *Renny v. Port Huron Hospital,* 427 Mich. 415, 429, 398 N.W.2d 327, 335 (1986):

> The jury decides as a matter of fact whether the employee was discharged for cause. While the jury may not substitute its opinion for that of the employer's, it may determine whether the employee committed the specific misconduct for which he was fired, whether the firing was pretextual, whether the reason for discharge amounted to good cause, or whether the employer was selectively applying the rules. It is not enough that an employer acted in good faith or was not unreasonable.

Given Michigan's strong preference for bringing these questions to a trier of fact and Pepsi–Cola's inability to cite any specific Michigan holding that the existence of customer complaints will constitute just cause as a matter of law, the trial court's decision on just cause was not in error.

Pepsi–Cola next claims that the trial judge exceeded his discretion when he held that Pepsi–Cola had to evaluate Diggs's performance "with the care that was customarily followed in make [sic] such evaluations." It claims that this establishes a contract of "customary care" which far exceeded the trial judge's right to effect remedies under *Toussaint.* Pepsi–Cola urges us to strike down what it terms the trial judge's efforts at social engineering. Diggs did not respond to this claim.

Once again, Pepsi–Cola presents no cases to support its position that the trial court was in error. Our examination of the trial court's opinion satisfies us that the challenged language does not impose any new and foreign standard upon Michigan's law of employment contracts but is rather another way of expressing the concepts of good faith performance which are always inherent in judging whether a given course of conduct is consistent with traditional contractual obligations.

## IV.

Pepsi–Cola argues that there is no basis for an award of front pay until retirement under a *Toussaint* contract. It claims that front pay awards are inherently speculative. Further, it argues that since *Toussaint* contracts are necessarily indefinite in duration, an award of front pay must perforce be speculative in nature. Pepsi–Cola cites authority from other jurisdictions for the proposition that front pay is inappropriate when there is no fixed term of employment. *See e.g. Benham v. World Airways, Inc.,* 432 F.2d 359 (9th Cir.1970); *Jeter v. Jim Walter Homes, Inc.,* 414 F.Supp. 791 (W.D.Okla.1976).

Diggs on the other hand correctly points out that under Michigan law a trial judge's award of damages is limited only by an abuse of discretion inquiry. *See Katch v. Speidel Division of Textron, Inc.,* 746 F.2d 1136, 1144 (6th Cir.1984). In awarding front pay, the district court placed particular reliance on *Bruno v. Detroit Institute of Technology,* 51 Mich.App. 593, 215 N.W. 2d 745 (1974), and *Stearns v. Lakeshore & M.S. Ry. Co.,* 112 Mich. 651, 71 N.W. 148 (1897), but Pepsi–Cola in turn questions the applicability of these decisions because they were applied in situations of fixed periods of employment. Since this case was briefed, two Michigan opinions have been issued which favor Diggs's position.

In *Renny v. Port Huron Hospital, supra,* the Michigan Supreme Court tacitly approved front pay in *Toussaint* cases. The court upheld a twenty-five year front pay award in the *Toussaint* case stating:

> Defendant hospital alleges that plaintiff suffered little or no past damages and was not entitled to future damages. Defendant bases its arguments on earlier decisions of this Court holding that future damages may not be awarded under employment contracts terminable at will.
>
> By establishing a just-cause contract, plaintiff has established a protected interest in her employment at the hospital.... There was sufficient evidence for the jury to conclude that plaintiff had in fact suffered damages and that the amount of damages was $100,000. We find no error.

427 Mich. at 438–39, 398 N.W.2d at 339 (citations omitted). Front pay in a *Toussaint* situation has even more recently been upheld by the Michigan Court of Appeals in *Ritchie v. Michigan Consolidated Gas Co.,* 163 Mich.App. 358, 413 N.W.2d 796 (1987). There, the court cited the trial court's language stating that:

> No Michigan Appeals court has yet ruled on the propriety of front pay damages in a *Toussaint* case. The award of front pay is an issue governed by the sound discretion of the trial court. *Davis v. Combustion Engineering,* 742 F.2d 916, 923 (6th Cir.1984). This Court finds that front pay is permissible in this case.

*Id.* at 372–73, 413 N.W.2d at 803. The court went on to look at the circumstances of the case, including the difficulty that the plaintiff had finding comparable employment after her discharge and concluded that front pay was an appropriate remedy in this instance. Given these two rulings, it seems clear that a front pay remedy was permissible, at least in principle, in the instant case.

Pepsi-Cola argues that even if front pay is permissible in some *Toussaint* situations, the 26.5 year award in this case is wholly speculative and without evidentiary support. The court based the award on the difference between Diggs's current salary and his former salary with Pepsi-Cola. The judge then multiplied this figure by 26.5 because he found "no basis for finding that his future loss of income will be either more or less than $9200 per year ... [and] no basis for projecting future income other than until age 65, a period of 26.5 years."

Pepsi-Cola cites several cases for the proposition that front pay is inappropriate in cases such as the present one where the existence of future losses is not more clearly established. It first mentions *Rodgers v. Fisher Body Div., G.M.C.,* 739 F.2d 1102 (6th Cir.1984). Pepsi-Cola claims that in *Rodgers* this court struck down a thirteen year front pay award based on findings similar to this case, because it was too speculative. *Id.* at 1107.

There are several differences between *Rodgers* and the instant case. *Rodgers* is not a *Toussaint* case, but is instead a Title VII action. More important, however, is the nature of the "speculation" in these two cases. In *Rodgers,* the problem was created when plaintiff's counsel presented a possible computation of damages to the jury during closing argument, writing figures on a blackboard. These figures included additions for fringe benefits and interest rates, neither of which had been fully explained during trial testimony. In overturning the verdict, Judge Potter, sitting by designation, announced that "[w]ith so little actual evidence of lost wages before it, the jury was no doubt unduly influenced by the extremely hypothetical figures presented by plaintiff's counsel in closing argument." *Id.* It therefore appears that the court in *Rodgers* was primarily concerned about jury confusion and the introduction of new material during closing argument. Thus, this precedent is not particularly persuasive.

Pepsi-Cola next cites *Shore v. Federal Express Co.,* 777 F.2d 1155 (6th Cir.1985). There, Judge Martin rejected a five-year front pay award, finding no basis in the record to support it. He said that "[w]hile a district court has considerable experience in calculating future earnings, some basis must appear in the record for such an award.... The record from the court be-

low contains no indication of the basis for the front pay award." *Id.* at 1160. Pepsi-Cola argues that there is also no evidence of future loss in the instant case. It claims that while Diggs's current income is lower than what he previously earned with Pepsi-Cola, his income will increase quickly in the insurance business because of the money he will get from repeat commissions.

Pepsi-Cola fails to mention that *Shore* is also a Title VII case. Judge Martin discussed the provisions and legislative history of Title VII in determining that the front pay award was invalid. *Id.* at 1158-59. He decided to evaluate the front pay award under "the standards applied to all Title VII relief: whether the award will aid in ending illegal discrimination and rectifying the harm it causes." *Id.* at 1159.

It is particularly important to note that Judge Martin did not bar the plaintiff from a front pay recovery: he merely said that the trial judge must base his award on a factual basis. He suggested:

> Some of the factors which district courts have employed to alleviate the speculative nature of future damage awards include an employee's duty to mitigate, "the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards."

*Id.* at 1160 (citing *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1168-69 (S.D.N.Y.1983). Judge Martin then remanded the case for a consideration of a front pay award in light of these factors. In the instant case, the trial judge did take into account many of the factors that Judge Martin mentioned. While his method could have been more scientific, it appears that he considered mitigation, work expectancy and the availability of other employment opportunities.

Another Sixth Circuit case cited by Pepsi-Cola is *Katch v. Speidel, Div. of Textron, Inc., supra.* In *Katch,* a panel of our court rejected a 19-year front pay award

as "far beyond any maximum limit which a jury could find to be compensatory," 746 F.2d at 1142, voicing particular concern about the possibility of a windfall from front pay awards. *Id.* at 1143. Similar concerns do exist here, but *Katch* is not entirely analogous. While *Katch* is a *Toussaint* case, the court's primary concern on appeal arose from the failure of the trial judge adequately to instruct on the issue of mitigation, resulting in a $2.2 million jury verdict which was only slightly reduced on remittitur. *Katch* did not reject the principle of law permitting an award of front pay.

A final Sixth Circuit case cited by Pepsi-Cola is *Davis v. Combustion Engineering, Inc.,* 742 F.2d 916 (6th Cir.1984), an age discrimination case. It is true that the *Davis* court discussed the awarding of front pay to relatively young employees and commented that the "award of front pay to a discriminatorily discharged 41 year old employee until such time as he qualifies for a pension might be unwarranted. On the other hand, the failure to make such an award for an employee age 63, likewise discriminatorily discharged, might be an abuse of discretion." *Id.* at 923. However, the cited observation was dicta; Davis was in fact 59 years old and the court upheld an award of six years front pay. Here, Diggs was 46.

Diggs argues that Michigan law is clear on the point that a damage award can only be set aside in an instance of a clear abuse of discretion. *See e.g. Katch,* 746 F.2d at 1144; *Wilson v. Beebe,* 743 F.2d 342, 347 (6th Cir.1984). He notes that the trial court's damage award is within the range of the evidence and therefore can withstand an abuse of discretion review.

The district judge has relied upon *Bruno v. Detroit Institute of Technology, supra,* for the proposition that the differential between past and present salary can be used to formulate a front pay award. 51 Mich. App. at 600-01, 215 N.W.2d at 749. Pepsi-Cola argues that because *Bruno* is a tenure case, it is not relevant. While this argument may lessen the persuasive force of *Bruno,* it does not destroy entirely its

usefulness in determining whether front pay is appropriate under *Toussaint*. Diggs also cites other authority permitting front pay awards without exhaustive evidence on future earnings. *See e.g. Goins v. Ford Motor Co.*, 131 Mich.App. 185, 347 N.W.2d 184 (1983) (difference between plaintiff's current wage and his replacement's current wage extended over forty years used as the basis of an award where he had been wrongfully discharged because of a handicap); *Tiffany v. Christman Co.*, 93 Mich.App. 267, 287 N.W.2d 199 (1979) (future income computation based on testimony that average annual wage increase in field was 6% held permissible).

We are bound to observe that those Michigan cases that have struck down front pay awards have involved either an error in jury instructions or damage awards entirely out of line with any reasonable recovery based upon the evidence presented at trial. Neither of these situations is presented here. The case was tried before an experienced judge knowledgeable in Michigan law. Further, while it is at least arguable that the award here was on the high side, we are unable to hold that it was shocking, unconscionable or entirely out of line with the evidence before him. Whatever the law may be in other states of the Sixth Circuit or elsewhere, it may fairly be said that Michigan has not disfavored front pay. As Judge Churchill observed:

> [D]efendant has unearthed several cases that stand for the proposition that damages in the form of future wages are not available in the case of a breach of an employment contract for an indefinite term. The reasoning underlying these cases is apparently that such damages are inherently speculative. While the cases cited by defendant may be accurate statements of the law in certain jurisdictions, they do not appear to reflect the position of the Michigan courts. As long ago as 1897, the Michigan Supreme Court held that the measure of damages for breach of an agreement to employ a person for life *or during his ability to work included the present worth of what he would have been able to earn in the future less any amounts he would be able to earn from other employment during that same time. See Stearns v. Lakeshore & M.S. Ry. Co.*, 112 Mich. 651 [71 N.W. 148] (1897). Indeed, to follow the defendant's position would eviscerate the remedy for breaches of lifetime or indefinite term employment contracts contemplated by the Michigan Supreme Court in its landmark decision of *Toussaint v. Blue Cross*, 408 Mich. 579 [292 N.W.2d 880] (1980).

If Michigan's view and indeed the principles of *Toussaint* are debatable, that is a debate for Michigan's lawmakers. Our duty in this diversity case is to follow the law which they make.

## V.

■ Pepsi–Cola contends that the district court erred in applying a discount rate of 5% to the front pay that it awarded to Diggs. It claims that Michigan law requires the court to apply a discount rate of 12%, the rate of prejudgment interest mandated by Michigan law.

As an initial matter, we observe that the determination of prejudgment interest and the accompanying discount rate calculations are a matter of substantive state law. In our recent decision of *Bailey v. Chattem, Inc.*, 838 F.2d 149 (6th Cir.1988), a panel of our court held that federal law governs the rate of postjudgment interest in diversity cases. However, that same court remarked that "prejudgment interest is a substantive aspect of damages in a diversity case and is thus properly viewed as a matter of state law...." *Id.*, at 159. Our court has repeatedly held that questions of prejudgment interest in diversity actions are to be determined under state law. *See, e.g., Rhea v. Massey–Ferguson, Inc.*, 767 F.2d 266, 270 (6th Cir.1985); *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 425 (6th Cir.1984); *Clissold v. St. Louis–San Francisco Ry.*, 600 F.2d 35, 38 (6th Cir.1979); *Lynch v. Electro Refractories & Abrasives Corp.*, 408 F.2d 363, 364 (6th Cir.1969).

Turning to Michigan law, we note that the only Michigan Supreme Court case that Pepsi–Cola can muster in its favor is *Kin-*

*ney v. Folkerts,* 84 Mich. 616, 48 N.W. 283 (1891). In *Kinney,* the court held that the correct discount rate "is arrived at by dividing a given sum by one dollar, plus the legal rate of interest, or the usual rate of interest." *Id.* at 624, 48 N.W. at 286. Pepsi–Cola also cites a Michigan Court of Appeals case, *Freeman v. Lanning Corp.,* 61 Mich.App. 527, 233 N.W.2d 68 (1975), for the proposition that a reduction of future damages to present value "requires that the total award found by the trial judge be apportioned on a yearly basis and discounted at the statutory rate." *Id.* at 531, 233 N.W.2d at 70. The statutory rate referred to is supplied by M.C.L.A. 600.6013 which provides that interest on money judgments in cases where the complaint was filed after June 1, 1980 is 12%.[2]

However, the precedent supporting the district judge is much more persuasive. A recent Michigan case, *Goins v. Ford Motor Co.,* 131 Mich.App. 185, 347 N.W.2d 184 (1983), upheld the 5% discount rate, relying on section 53.03 of Michigan's Standard Jury Instructions which provides for a 5% rate. The court took specific note of the *Lanning* case, but disagreed with it. The court stated "[t]here is nothing within the language of 6013 that suggests that it applies to the computation of future damages to present value." *Id.* at 201, 347 N.W.2d at 192.

*Goins* relied heavily upon *Tiffany v. The Christman Co.,* 93 Mich.App. 267, 287 N.W.2d 199 (1979). The *Tiffany* court found the reasoning of *Lanning* to have some merit but stated "we believe that any variation from this rule should come either from the Supreme Court or the Legislature." *Id.* at 288, 287 N.W.2d at 208. These two decisions were relied upon when another Michigan court of appeals upheld the 5% discount rate in *Kovacs v. Chesapeake & Ohio Ry.,* 134 Mich.App. 514, 351 N.W.2d 581 (1984), *aff'd* 426 Mich. 647, 397 N.W.2d 169 (1986).

*Kovacs* was appealed to the Michigan Supreme Court, which upheld the decision. The court based its decision, in part, upon the language or M.C.L.A. § 600.6306, a tort reform statute passed in 1986. The court stated:

> One of the tort reform acts enacted last summer, 1986 P.A. 178, provides that "[a]fter a verdict rendered by a trier of fact in favor of a plaintiff," the court shall enter a judgment for, among other things, all future economic and all future non-economic damages "reduced to gross present cash value," which later term is defined as meaning "the total amount of future damages reduced to present value at a rate of 5% per year for each year in which those damages accrue." The Legislature thus has opted for the five percent rate. Although the amendatory provision is not effective except as to cases filed on or after October 1, 1986, we conclude, in light of the legislative action, that no further consideration should be given to the reduction to present value issue.

*Id.* at 649–50, 397 N.W.2d at 170. Thus, both the Michigan legislature and the Michigan Supreme Court have recently supported the 5% discount rate.

Our court considered this issue in *Katch, supra.* We held that "[w]ithout ruling on this issue which is unclear under Michigan law, we observe that the five per cent interest rate or discount rate is contrary to the more realistic rates noted in M.S.A. 27A.6013." *Katch,* 746 F.2d at 1142. Given the recent *Kovacs* decision and the promulgation of M.C.L.A. § 600.6306, we can no longer view the issue as undecided in Michigan. Thus, we must uphold established Michigan law and enforce the 5% discount rate.

■ Pepsi–Cola further argues that the court erred in discounting the front pay award back to the date of judgment, as opposed to the date the complaint was

2. The statute provides in pertinent part:
(4) For complaints filed on or after June 1, 1980, but before January 1, 1987, interest shall be calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate of 12% per year compounded annually unless the judgment is rendered on a written instrument having a higher rate of interest.

filed. It argues that since prejudgment interest is allowed on front pay and such interest is paid from the date of the complaint, it would only be reasonable to discount the front pay award to that date. *Bruno, supra,* echoes this sentiment:

Since the interest on the judgment statute, M.C.L.A. 600.6013; M.S.A. 27A.6013, provides that the statutorily mandated interest on the judgment shall run from the filing of the complaint, if the damages for the years subsequent to the filing of the complaint were not reduced to their worth at that date, plaintiff, by the operation of the statute, would be given interest on monies from a time prior to the time they were owed to him.

51 Mich.App. at 600 n. 1, 215 N.W.2d at 749 n. 1. After the briefs were filed in the instant case, our court decided *Walker v. Consumers Power Company,* 824 F.2d 499 (6th Cir.1987). In *Walker* we stated:

If an award is granted, it should take into account interest from the date damages accrued to the time the complaint was filed. *Michigan Standard Jury Instructions 2d* 53.04. Under Michigan law a trial court is required to instruct a jury on reducing future damages to present value as of the date of fillng the complaint; or must itself reduce the award to present value.

*Id.* at 505 (citations omitted). Diggs did not respond to this claim by Pepsi–Cola. In fact, none of the cases cited by Diggs discusses the issue of how far back to discount a front pay award. Further, the jury instruction that Diggs has relied on for the 5% discount rate does not speak to the question of the appropriate discount date. Both fairness and precedent dictate that we reverse the district court on this issue and thus avoid the duplicative award of interest that would otherwise result.

■ Pepsi–Cola's final argument as to the calculation of the judgment is that the district judge erred by treating all the back pay accrued prior to judgment as a lump sum for the purpose of awarding prejudgment interest. It claims that wages for the period from the date of filing to the date of judgment should first be reduced to their present value as of the date of fillng before prejudgment interest is applied to them. Pepsi–Cola once again draws support from *Bruno.* In considering a similar issue, that court announced that "to the extent that such damages occurred after the date of the filing of the complaint, the damages should be reduced to their worth at the time of the filing of the complaint." *Bruno,* 51 Mich.App. 599–600, 215 N.W.2d at 749.

Diggs responds that M.C.L.A. § 600.6013 treats damages as a lump sum, citing *American Anodco, Inc. v. Reynolds Metals Co.,* 572 F.Supp. 895 (W.D.Mich.1983), *aff'd* 743 F.2d 417 (6th Cir.1984), for this proposition. *Anodco* was a diversity case brought to enforce a requirements contract between the parties. Anodco alleged that it was to fulfill all of Reynolds's anodizing needs for Oldsmobile X-car bumpers for 1979–1981. When Reynolds decided to anodize its own bumpers in January of 1980, Anodco instituted this suit. Judgment was rendered for Anodco on May 11, 1982. Thus, Anodco's damages occurred almost entirely in the period between the date of filing of the complaint and the date of judgment.

One of several issues decided by the district court after the issuance of the judgment was that prejudgment "interest shall be calculated based on the entire damage award, which should not be apportioned." *Id.* at 896. The court relied on the language of M.C.L.A. § 600.6013, which calls for prejudgment interest to run from the date of the filing of the complaint, and does not mention the possibility of apportionment. *Id.*

A panel of our court upheld the *Anodco* decision, but we did not specifically discuss the apportionment issue. Instead, we deferred to the judgment of the district court on this and several other interest calculation issues, stating:

The district judge found that the purpose of this statute [M.C.L.A. § 600.6013] would be best effectuated by permitting interest to be compounded from the date the complaint is filed. We cannot say this construction of the statute is errone-

ous or that the district court abused its discretion in the interest award in this case. In diversity cases, federal courts follow state law on the question of prejudgment interest.

743 F.2d at 425.

Our review of Michigan law shows that the question has not been definitively resolved by Michigan's courts. One panel of the Michigan Court of Appeals has held that prejudgment interest on service fees payable after the complaint was filed does not accrue until the date on which those fees become due. *Central Michigan University Faculty Ass'n v. Stengren,* 142 Mich.App. 455, 370 N.W.2d 383 (1985). However, another panel has recently held that prejudgment interest on the entire judgment is available from the date of the filing of the complaint, even if some of the damages involve future payments. *OM-EL Export Co. v. Newcor, Inc.,* 154 Mich. App. 471, 398 N.W.2d 440 (1986). *See also Goins,* 131 Mich.App. at 202, 347 N.W.2d at 192 (holding that the trial court erred in not awarding prejudgment interest on future damages).

Our court has consistently held that the judgment of a local district judge sitting in a diversity case, as to the application of state law, is entitled to considerable deference. *Agristor Leasing v. Saylor,* 803 F.2d 1401, 1407 (6th Cir.1986); *Martin v. Joseph Harris Co.,* 767 F.2d 296, 299 (6th Cir.1985). In *Rudd–Melikian v. Merritt,* 282 F.2d 924, 929 (6th Cir.1960), a panel of our court stated that:

> the rule appears well settled that in diversity cases, where the local law is uncertain under state court rulings, if a federal district court judge has reached a permissible conclusion upon a question of local law, the Court of Appeals should not reverse, even though it may think the law should be otherwise. As said in a number of cases, the Court of Appeals should accept the considered view of the District Judge.

(Citations omitted). Applying the law of this circuit, we conclude that the district court's decision to treat all backpay ac-crued prior to the date of judgment as a lump sum must be affirmed.

We readily admit that a rule of law in Michigan which would avoid the risk of some technical double imposition of interest might be desirable and could in fact be achieved by a different application of Michigan's unique statute, which measures the computation of interest from the date of filing of the complaint rather than from the date of judgment. For cases involving Michigan law which are tried in Michigan courts and may consist both of liquidated and unliquidated damages, a simple resolution of the problem would be to try each case as if it were being tried on the date suit was actually commenced. Interest on liquidated damages accruing prior to that date could therefore be calculated to a fixed date without regard to the date the judgment might ultimately enter. Also, damages accruing after the date of commencement of suit could be discounted back to the date of filing. With a single date that the parties are aware of in advance, the finder of fact should have little difficulty making appropriate calculations. Further, an attorney could frame his proofs knowing that the date of commencement of the action was the critical date for the addition or discount of interest.

Michigan law contemplates that a judgment, representing the amount owed as of the date of filing, is to be entered and that thereafter interest is to accrue from the date of filing until the judgment is paid at whatever the particular statutory rate may be. Ideally, this resolves all questions fairly. However, Michigan's courts have not seen fit to hold to this rule and we are bound by what we believe Michigan courts would do, rather than what we may think personally would be the result most harmonious with the state statute. Therein lies our difference with the dissenting judge.

Diversity cases tried in federal court present an additional problem because the calculation of postjudgment interest is a question of federal law. While Michigan law directs that we measure all damages, both before and after the date of judgment, without regard to that date, and from the

date of commencement of suit, federal law requires that we calculate prejudgment and postjudgment interest separately. Thus, even if we wished to construe Michigan law in the manner described above, we would be unable to do so. The trial court, in accommodating the tension between the state and federal requirements, reached the result to which we have deferred. It is true that the result lacks the symmetry of Judge Merritt's approach and may cause some overassessment of interest upon payments which accrue after the date of filing of the complaint but have not been discounted back to it. The Michigan courts of appeal emphasize that, despite this problem, the primary concern of the legislature in enacting the prejudgment interest statute was not to avoid the overassessment of interest but to protect prevailing injured parties from the loss of interest due to deliberate delays induced by the defense in order to prevent the running of interest until judgment was ultimately entered. *Drake v. Norge Division, Borg–Warner Corp.*, 367 Mich. 464, 466, 116 N.W.2d 842 (1962), cited by Judge Merritt, appears concerned only with protection for the plaintiff whose right to recovery of benefits was unfairly delayed. It makes no mention whatever of Michigan's unique interest statute which, in fact, was not in effect at the time of *Drake* anyway.[3] Thus *Drake* neither provides authority nor guidance for us here.

The decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for a recalculation of the

damages and entry of a new judgment consistent with this opinion.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I concur in all of Chief Judge Engel's opinion, with the lone exception of the final issue treated, that of prejudgment interest on the pay award for the period between date of complaint and date of judgment.

The award of prejudgment interest in a diversity case is a matter of state law because this type of interest is an element of the plaintiff's damages. The Michigan statute is prescriptive, not discretionary; thus, the award of interest here is not a matter of discretion but rather a matter of law. As Chief Judge Engel notes, there is some disagreement among the intermediate appellate courts in Michigan about how accrual of "front pay" or other "future damage" awards should be treated for purposes of prejudgment interest. *See, e.g., Om–El Export Co. v. Newcor, Inc.*, 154 Mich.App. 471, 398 N.W.2d 440 (1986); *Central Michigan University Faculty Ass'n v. Stengren*, 142 Mich.App. 455, 370 N.W.2d 383 (1985); *Goins v. Ford Motor Co.*, 131 Mich.App. 185, 347 N.W.2d 184 (1983). One panel of the Michigan Court of Appeals appears to have gone so far as to openly disregard a contrary view earlier espoused by the Michigan Supreme Court. *See Ombrello v. Montgomery Ward Long Term Disability Trust*, 163 Mich.App. 816, 415 N.W.2d 658, 662 (1987) (rejecting without explanation *Drake v. Norge Division*,

---

**3.** At the time of the *Drake* decision, Michigan courts awarded interest under 1915 Mich.Pub. Acts 314, ch. XXIII, § 20, which provided that:

When execution shall be issued upon any judgment or decree, interest on the amount thereof from the time of entry of the same until such amount shall be paid, shall be collected at the rate of five per cent per annum....

While the Michigan legislature had enacted the Revised Judicature Act, 1961 Mich.Pub.Acts 236, prior to the *Drake* decision, that statute did not become effective until January 1, 1963, after *Drake* was decided. The revised statute provided, in section 6013 (now codified at Mich.Comp. Laws § 600.6013) that:

Execution may be levied for interest on any money judgment recovered in a civil action,

such interest to be calculated from the date of judgment, at a rate of 5% per year....

The first version of section 600.6013 to calculate interest back to the date of filing was 1965 Mich.Pub.Acts 240, which amended the Revised Judicature Act of 1961. The new law stated that:

Execution may be levied for interest on any money judgment recovered in a civil action, such interest to be calculated from the date of filing the complaint at the rate of 5% per year....

While the statutory rate of interest has varied since 1965, the principle of calculating interest from the date of filing has remained basically unchanged.

*Borg–Warner Corp.,* 367 Mich. 464, 466, 116 N.W.2d 842 (1962)).

*Drake* was a workers compensation case in which the Michigan Supreme Court, relying on previous cases that had calculated interest on installment benefits *from the time they became due,* reaffirmed the principle that such a calculation "finally establishes a parity between the employee who ultimately collects accrued benefits and the employer who redeems a claim by paying benefits in advance,—*at a commuted value, of course.*" 367 Mich. 464, 116 N.W.2d at 844 (emphasis added). This balancing principle of *Drake* is unaffected by subsequent changes in the Michigan interest statute; a mere change in the date from which interest is calculated would not disturb the deeper principle based on "the elementary nature of the equities" that the employee receives no "less than he is entitled to receive" and that the employer does not have "free use of money determined to have been due the employee." *Id.*

While I agree that there are occasions in which our Court may accord some deference to the state-law expertise of a district judge, I do not concur that this is one of them. We might defer, for example, to the greater familiarity a district judge may have with the evolving direction of that state's highest court in an area of considerable uncertainty. And certainly, to the extent that a district judge writes a detailed opinion explaining a problem of state law, that opinion is entitled to, and receives, deference from our Court. But that would be true of any learned and detailed opinion from a district court, not just those on a topic of state law. Well-founded legal analysis is always entitled to considerable persuasive value.

What we have in this case, however, is an issue on which the state intermediate appellate courts have floundered and the state's highest court, while recently silent on this specific question, has articulated some general principles. I believe that, if we believe the district judge erred, it is an abdication of our responsibility as an appellate court to give the parties less than de novo review of this question. *See In re*

*McLinn,* 739 F.2d 1395 (9th Cir.1984) (en banc); 19 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4507 at 106–10.

Confusion in the state intermediate courts should not deter us from deciding in a diversity case what the state's highest court would do. I believe that the only proper approach that would avoid "double counting" is to reduce the schedule of complaint-to-judgment payments to their present value at the time of the filing of the complaint. This approach produces the same result as triggering interest from the time that each installment payment is due; it takes account of the "straightforward interpretation of the prejudgment interest statute" favored by the Michigan Supreme Court, *see Om–El,* 154 Mich.App. 471, 398 N.W.2d at 445 (citing *Rittenhouse v. Erhart,* 424 Mich. 166, 380 N.W.2d 440 (1985)), without falling into the vice of double counting.

Unlike Chief Judge Engel, I find no contrary authority in *American Anodco, Inc. v. Reynolds Metals Co.,* 572 F.Supp. 895 (W.D.Mich.1983), *aff'd* 743 F.2d 417 (6th Cir.1984). A careful review of the *Anodco* case, including its affirmance by this Court, reveals that the discussion of "apportionment" refers not to accrual of the schedule of payments or to reduction to present value at the time of the complaint but rather to "apportioning" the rate of interest before and after a statutory change in the rate of interest. *Anodco,* therefore, is of no help to Diggs. I would reverse the District Court on this issue as a matter of law.

KRUPANSKY, Circuit Judge, concurring in part, dissenting in part.

Because the majority's disposition of the diversity case at bar extends the wrongful discharge doctrine of *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980) in a manner inconsistent with Michigan court precedent, I am constrained to respectfully dissent from the majority's opinion.

This appellate review must determine if the defendant, in terminating its employee

plaintiff Sydney Diggs (Diggs), breached a contract with the plaintiff to discharge him only for "just causes." Diggs anchored his complaint solely upon a statement of Keith Haslam (Haslam), Pepsi's regional sales manager. The contract relied upon by the majority in affirming the trial court's disposition is inferred from the following controversial colloquy between Haslam and Diggs during 1978:

I [Diggs] said: well, what do we as district managers—you know, what assurances do we have that at some point in time the company could come in and arbitrarily dismiss us for no apparent reason. He [Haslam] said: well, you don't have anything to worry about. He said: as long as your performance is satisfactory, you won't have to worry about anything like that.

He said: besides, every manager I've got here has been rated commendable, you know, on all the appraisals they received, so you don't have anything to worry about.

I took that to mean that I didn't have anything to worry about, because this was my regional manager, he was the highest ranking individual representative from Pepsi at that time.

So I took that to mean my job was secure, as long as I performed my job satisfactorily.

Diggs interpreted this conversation to mean that he would be terminated for "just cause" only as evidenced by a performance evaluation that fell below a rating of "commendable." However, Ken Yoder (Yoder), Division Vice President of Pepsi–Cola Metropolitan Bottling Co. (Pepsi), testified the company did not have a "just cause" employee termination policy.

In September 1982, Pepsi Regional Sales Manager Brian Beattie rated the plaintiff as "C-" or "commendable minus." The appraisal identified poor performance in several areas, including sales (Diggs had fallen 7.3% below his assigned sales quota), merchandising, and supervision of his route salesmen.

During succeeding months, Diggs' performance deteriorated and Beattie repeatedly counseled Diggs about the poor quality of service that he was providing to Pepsi's key accounts. During 1982–83, representatives of the three largest grocery chain accounts in Diggs' region complained to the plaintiff's superiors about his inefficient servicing of their stores.

Subsequent to these complaints, Beattie recommended to his superiors that Diggs be terminated. Yoder approved the termination in June or July of 1983 and directed Beattie to complete a written annual performance appraisal for Diggs. The August, 1983 appraisal for the period between September, 1982 through September, 1983 scored Diggs as "fair," a rating that was below commendable. After his discharge, Diggs filed the instant lawsuit and at the conclusion of a bench trial the district court ruled in his favor applying its interpretation of Michigan law as enunciated in *Toussaint*. From this ruling, Pepsi appealed.

Initially, this court must determine the level of deference due to the district court's finding that Haslam had promised Diggs that he would not be discharged except for "just cause." According the trial court's findings of fact the deference of the "clearly erroneous" standard dictated by existing precedent, this appellate review must thereafter independently decide the legal effect of those factual findings. *See Taylor and Gaskin v. Chris–Craft Industries*, 732 F.2d 1273 (6th Cir.1984). *Cf. Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825, 844–46 (6th Cir. 1988) (after deciding that factfinder's findings as to the operative facts are not clearly erroneous, the appellate court must independently decide the legal effect of those facts); *Blackburn v. Foltz*, 828 F.2d 1177, 1181 (6th Cir.1987) (mixed questions of fact and law are not subject to clearly erroneous standard); *United States v. Weingarden*, 473 F.2d 454, 460 (6th Cir.1973) (mixed findings of fact and law are subject to appellate review without application of the clearly erroneous rule).

In reviewing *de novo* the legal effect of Pepsi's promise to Diggs, an examination of the scope of *Toussaint* is in order. This court is *Erie*-bound to abide by the stan-

dards set forth in *Toussaint* and cannot "push the *Toussaint* rationale far beyond the limits to which it has thus far been confined by the Michigan courts." *Dabrowski v. Warner–Lambert Co.*, 815 F.2d 1076, 1081 (6th Cir.1987).

As the majority has readily conceded, "as a matter of direct precedent, the only case that Diggs can cite is *Toussaint* itself." However, a review of *Toussaint* belies the majority disposition. The promise at bar, construed most liberally in favor of Diggs, conveyed only the promise that he would be retained in his employment so long as his performance was "satisfactory" to Pepsi.

In *Toussaint*, the Michigan Supreme Court was careful to reaffirm the proposition that an employer's promise to retain an employee for so long as his performance was "satisfactory" does not give rise to a "just cause" contract. The Michigan high court specifically distinguished "just cause" contracts from "satisfaction" contracts. *Toussaint*, 292 N.W.2d at 895–96. Moreover, the court noted that an employer could discharge under a "satisfaction" contract at any time the employer was in "good faith" dissatisfied with the employee's performance or behavior. *Id.* at 896.

In the instant case, there can be little doubt that Pepsi's promises made out, at most, only a "satisfaction" contract. According to plaintiff's own testimony, Haslam told Diggs that his (Diggs') employment would continue "as long as your performance is *satisfactory.*" Moreover, Diggs interpreted the contract as a "satisfaction" contract. He testified that, "I took that to mean my job was secure, as long as I performed my job *satisfactorily.*" The district court itself found that "they [Pepsi] did establish a contract with this man and that he would not be discharged in violation as long as his performance was *satisfactory.*"

In cases involving similar promises, the Michigan courts have held that such prom-

ises constitute only a "satisfaction" contract. In *Schmand v. Jandorf*, 175 Mich. 88, 140 N.W. 996 (1913), the Michigan high court concluded that a promise to employ "for the period of one year ... subject ... to the satisfaction" of the employer was merely a "satisfaction" contract. Moreover, in *Sax v. Detroit G.H. & M. Ry. Co.*, 125 Mich. 252, 84 N.W. 314, 315 (1900), the court decided that an agreement to give an employee "a permanent position" during his lifetime, as long as he should perform his duties to the satisfaction of the company constituted only a "satisfaction" contract.[1] *See also Koehler v. Buhl*, 94 Mich. 496, 54 N.W. 157, 158–59 (1893) (contract that employee's work "shall be done to the satisfaction of said firm" was not just cause contract); *Carpenter v. American Excelsior Co.*, 650 F.Supp. 933, 936 n. 6 (E.D.Mich.1987) (statement that employee would be employed "as long as your work is satisfactory" does not establish just cause contract).

Since the instant promise constituted only a "satisfaction" contract, judicial review of the employer's termination decision was, in the instant case, extremely limited. *See e.g., Lynas v. Maxwell Farms*, 279 Mich. 684, 273 N.W. 315, 317 (1937) (in "satisfaction" contract, "whether or not the services were satisfactorily performed was a question to be determined by defendant and not by the jury"); *Brown v. Chris Nelsen & Son, Inc.*, 10 Mich.App. 95, 158 N.W.2d 818, 819–20 (1968) (reaffirming rule set forth in *Lynas*); *Schroeder v. Dayton Hudson Corp.*, 448 F.Supp. 910, 916 n. 3 (E.D.Mich.) *modified on other grounds*, 456 F.Supp. 650 (E.D.Mich.1978) (same).

In *Toussaint*, the Michigan court has affirmed the vitality of cases such as *Lynas*. It has decided that in a "just cause" contract "there must be some review of the employer's decision if the cause contract is to be distinguished from the satisfaction contract." The dictate of Michigan decisions clearly mandates that judicial review

---

**1.** The instant case is even more explicit than *Schmand* and *Sax* because the employee in those cases was promised employment for a specified period of time—one year in *Schmand* and lifetime employment in *Sax*. In the case at bar, Diggs was promised employment for no specific duration and, therefore, his contract was a "pure satisfaction" contract.

of the substance of an employer's decision was not available in interpreting a "satisfaction" contract. Instead, judicial review was limited to determining whether the employer acted with *subjective* good faith or reasonableness when it discharged the employee. *Cf. Toussaint*, 292 N.W.2d at 896 (distinguishing "satisfaction" contract in which only good faith review is possible from "just cause" contract). *See also Schmand*, 140 N.W. at 999 (satisfaction of employer refers to *subjective* satisfaction of defendant); *Isbell v. Anderson Carriage Co.*, 170 Mich. 304, 136 N.W. 457, 460–61 (1912) (in "satisfaction" contract, dissatisfaction of employer is "purely a personal matter"); *Sax*, 84 N.W. at 316 ("the reasons for, or justice of, the defendant's satisfaction cannot be inquired into"); *Schroeder*, 448 F.Supp. at 916 n. 3 (same).

The district court and the majority have disregarded this entire line of the Michigan judicial precedent applied to "satisfaction" cases and have elected to sua sponte interpose an issue that has not been raised by Diggs and has imposed the "implicit duty on the part of Pepsi–Cola to make the [performance] rating determinations objectively and fairly." Appellee's only charge against Pepsi has been that it entered into and breached a contract to retain him so long as his performance rating was "commendable" or better. Absent a "just cause" termination policy, the record failed to disclose any standard for reviewing the performance of employees that appellant was required to implement preliminary to the discharge of an employee. Plaintiff's sole self-serving testimony concerning the evaluation system was as follows:

> He [Haslam] said: besides, every manager I've got here has been rated commendable, you know, on all the appraisals they received so you don't have anything to worry about.

The statement merely attested to a historical fact—that every manager before Diggs had been rated as "commendable." Haslam's description of past practice did not create a "just cause" contract. *Cf. Henry v. Hosp. and Health Serv. Credit U.*, 164 Mich.App. 90, 416 N.W.2d 338, 340 (Mich. App.1987) (past practice of employer in fir-

ing employees only for reasons that might imply "just cause" did not create "just cause" contract). Nor was there evidence in the record from which it could be inferred that Diggs' performance evaluations were predicated upon standards or procedures that were not objective and fair. All available evidence was to the contrary and supported the conclusion that his performance ratings were "fairly and objectively" assigned.

Nor can a promise of fair and objective evaluation be derived from the mere existence of an evaluation system. It is well-established that *Toussaint* guarantees do not arise from an employer's mere use of formal performance appraisal systems. *See, e.g., Kay v. United Technologies Corp.*, 757 F.2d 100 (6th Cir.1985) (formal performance evaluation system did not constitute a *Toussaint* just cause contract); *Rouse v. Pepsi–Cola Metropolitan Bottling Co.*, 642 F.Supp. 34 (E.D.Mich.1985 ) (holding that Pepsi's evaluation plan identical to the one at issue in this case did not create a just cause contract); *Copeland v. Pepsi–Cola Metropolitan Bottling Co.*, No. 84–CV–1180–DT, slip op. (E.D.Mich. April 17, 1985) (Pepsi evaluation plan, combined with oral promise that plaintiff had a future with the company, insufficient to create just cause contract). *Cf. Dabrowski*, 815 F.2d at 1080–81 (company's written policy of making "objective" selection decisions did not constitute an implied employment contract).

Accordingly, appellee's attempts to distinguish Pepsi's promise from a "satisfaction" contract are unpersuasive.

Even if plaintiff had proved a "just cause" contract, a review of the record is convincing that Pepsi possessed "just cause" for its discharge of Diggs and had not breached the purported contract.

Because the district court's conclusions concerning the issue of "just cause" are inconclusive and because the trial court had erroneously shifted the burden of proving a "just cause" termination to the defendant contrary to this circuit's pronouncements in *Taylor v. General Motors Corp.*, 826 F.2d

452, 456 (6th Cir.1987), I take issue with the district court's analysis. The trial court concluded that:

> The evidence with respect to the issue of performance is conflicting. The plaintiff has not proven that a fair objective evaluation of his actual performance would have been better than substandard. Neither has the defendant proven that it would have been substandard. The complaints from the defendant's customers were a legitimate concern to the defendant. It is by no means clear, however, that the plaintiff's performance justified the complaints. His satisfactory or better performance for several years taken together with the fact that his performance had earned him an offer of promotion to regional sales manager in Coldwater weighs in his favor. The defendant has the burden of proof on this issue. *See Rasch v. City of East Jordan,* 141 Mich.App. 336, 340 [367 N.W.2d 856] (1985). It has failed to meet this burden.

I agree with the majority that Michigan legal precedent in this area may not be "entirely clear;" however, the weight of recent Michigan judicial pronouncements directs that the burden of proof ultimately remains with the plaintiff employee to prove wrongful discharge. In *Duke v. Pfizer, Inc., Div. of Pfizer Hosp.,* 668 F.Supp. 1031, 1040 (E.D.Mich.1987), the court specifically decided that the defendant bears the burden to come forth with only "some evidence" of "just cause." Following the rule of *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the *Duke* court decided that after the employer introduces some evidence of "just cause," the burden shifts back to the employee who must prove a lack of "just cause." 668 F.Supp. at 1040.

As the *Duke* court noted, the *Burdine* shifting burden of proof analysis is used a variety of employment discrimination contexts. The rule the majority urges would

have the anomalous effect of placing "a lighter burden on employers accused of racial discrimination than employers faced with wrongful discharge claims." *Id.* at 1040. The *Duke* court also correctly observed that "such a rule is counterintuitive and makes little sense in light of the relatively greater protections the law has tried to provide alleged victims of race discrimination." *Id.*

The rule in *Duke* is consistent with the rule set forth in *Johnson v. Jessop,* 332 Mich. 501, 51 N.W.2d 915, 917 (1952). The Michigan Supreme Court specifically decided that the plaintiff had the ultimate burden of proof to prove an employment contract and the plaintiff's performance of that contract. Only after plaintiff had introduced such proof would the burden shift to the defendant. *Id. See also Saari v. George C. Dates & Assoc.,* 311 Mich. 624, 19 N.W.2d 121, 123 (1945) (same); *Rasch v. City of East Jordan,* 141 Mich.App. 336, 367 N.W.2d 856, 858 (1985) (same). In the instant case Diggs failed to prove his performance of the contract; accordingly, the burden of going forward never shifted to Pepsi.

Application of the *Burdine* analysis to *Toussaint* cases comports with the decision in *Obey v. McFadden Corp.,* 138 Mich.App. 767, 776–79, 360 N.W.2d 292, 296–97 (1984), *lv. denied,* 422 Mich. 911 (1985) (approving instruction that plaintiff had ultimate burden of proof at every step and holding that defendant was entitled to judgment notwithstanding the verdict because plaintiff failed to prove lack of just cause for termination). *Cf. Ross v. State Farm Ins. Co.,* 676 F.Supp. 781, 785–86 (E.D.Mich.1987) (refusing to shift ultimate burden of persuasion from plaintiff to the employer).

Finally, it should be noted that the Sixth Circuit in *Taylor v. General Motors Corp.,* 826 F.2d at 456, has decided that the Michigan courts would apply the *Burdine* shifting analysis to retaliatory discharge cases.[2]

---

**2.** The *Taylor* court relied on the Michigan Court of Appeals decisions in *Bogue v. Teledyne Continental Motors,* 136 Mich.App. 374, 356 N.W.2d 25 (1984) (sanctioning use of jury instructions

based on *Burdine* in an employment discrimination case) *and Clarke v. Uniroyal Corp.,* 119 Mich.App. 820, 327 N.W.2d 372 (1982) (*Burdine*

This court has also recently decided that the burden of persuasion in a race discrimination action under Michigan's Elliott–Larsen Act, Mich.Comp.Laws Ann. § 37.2202(1), "rests at all times with the plaintiff." *Lewis v. Sears Roebuck & Co.*, 845 F.2d 624, 634 (6th Cir.1988). While the instant appeal does not involve a claim of retaliation or discrimination, the majority presents no reason why the Michigan courts would accord an employer more protection in retaliation cases involving important statutory rights than in implied contract cases such as the one at bar.

In short, the weight of Michigan and Sixth Circuit authority supports the application of the *Burdine* shifting burden analysis. After Pepsi introduced "some evidence" of just cause, the burden shifted back to Diggs to prove by a preponderance of the evidence the elements of his case which he failed to do. As the district court and the majority have conceded, plaintiff has not proven the absence of "just cause." Accordingly, his action should have been dismissed.

My decision would be no different even if the burden of proof were placed on Pepsi. Regardless of Pepsi's burden, it is clear that Pepsi proved just cause for the discharge of Diggs.[3]

"Just cause" must be defined with reference to the contract in question. *See Kay*, 757 F.2d at 102, (citing *Valentine v. General American Credit, Inc.*, 420 Mich. 256, 362 N.W.2d 628 (1984) (extent of just cause obligation is based on agreement of the parties)). In the case at bar, the purported contract was merely to employ Diggs so long as his performance was "satisfactory" or as long as he achieved "commendable" ratings or better. Diggs failed to achieve the required performance ratings as evi-

denced by the escalating number of Pepsi customer complaints registered against him by Pepsi's biggest volume accounts.

Assuming *arguendo* that Pepsi had the duty of "fairly and objectively" rating appellee's performance that has been erroneously imposed by the district court, the record clearly disclosed that Pepsi discharged its duty. As early as September, 1982, Pepsi rated the plaintiff as "commendable minus." He was counseled by Beattie, his immediate supervisor, to improve his performance to no avail. Plaintiff was also rated below "commendable" in August 1983 just before he was terminated. The evidence also reflected that Diggs' inability to meet his assigned sales quotas was cascading.

The lower court did not find that these evaluations were unjustified. Instead, the court conceded that numerous major customers had complained about Diggs and that those complaints were "a *legitimate* concern to the defendant."[4] The court remarkably elected to disregard those complaints and instead based its ruling on the fact that Diggs' *past* performance was satisfactory or better. However, the purported contract was to retain Diggs only so long as he *continued* in the present and into the future to maintain a commendable performance rating.

The uncontroverted testimony disclosed that Pepsi's highly competitive business is anchored in customer service and satisfaction and that one of the district manager's primary duties was to promote and maintain the company's goodwill and reputation with its customers. Given the lower court's conclusions that Diggs failed to promote and maintain goodwill with Pepsi's largest customers, it was clear that the

---

analysis applied to claim brought under Michigan Fair Employment Practices Act).

**3.** Although the majority anchors its decision solely on the proposition that the trier of fact must decide the existence of "just cause," Michigan courts have not hesitated to reverse jury verdicts under circumstances where the plaintiff failed to produce evidence of sufficient weight to justify submission of the issue of "just cause" to the jury for consideration. *E.g., Obey,* 360 N.W.2d at 297 (holding that the trial court erred

in refusing to direct a verdict finding there was good cause for plaintiff's discharge).

**4.** It is uncontroverted that Pepsi's three largest customers in Diggs' territory each complained about Diggs' poor service. The district court declined to make a finding as to whether those complaints were justified but said the complaints were "probably in part justified and probably not totally justified."

September, 1982 and August, 1983 performance ratings were "fair" and based on "objective" facts (the customer complaints and failure to meet assigned sales quotas).

It was of no consequence that the customer complaints may not have related to the performance of plaintiff's job duties. Regardless of plaintiff's performance, the mere existence of customer complaints made the continued employment of Diggs economically impossible. In such cases an employer is not required to retain an employee. *Cf. Friske v. Jasinski Builders, Inc.,* 156 Mich.App. 468, 402 N.W2d 42, 44 (1986), *lv. denied,* 428 Mich. 880 (1987) (discharge for economic reasons constitutes termination for "sufficient cause;" to hold otherwise would impose an unworkable economic burden upon employers); *Parker v. Diamond Crystal Salt Co.,* 683 F.Supp. 168 (W.D.Mich.1988) (same). "The jury is not to probe the business judgment of the employer." *Lewis,* 845 F.2d at 633. The fact that an employer's termination decision is based on sound business judgment tends to indicate that the employer's termination decision was reasonable. *Id.* at 18.

Although the Michigan courts have not decided the specific question of whether customer complaints constitute just cause as a matter of law, courts in other jurisdictions have decided that an employer's business judgment must be accorded substantial deference when it attempts to preserve the company's goodwill and business reputation, *See Cox v. Resilient Flooring Div. of Congoleum Corp.,* 638 F.Supp. 726, 732 (C.D.Cal.1986) (good cause was shown where employee did not deny that complaints were lodged against him by the company's distributors; "[o]ne could not fairly evaluate his performance if these complaints were ignored"). *Cf. Kinoshita v. Canadian–Pacific Airlines, Inc.,* 803 F.2d 471, 475 (9th Cir.1986) (harm to reputation of employer was legitimate ground for termination); *Fountain v. Safeway Stores, Inc.,* 555 F.2d 753, 756 (9th Cir. 1977) ("an employer may enforce those regulations ... which serve to extend an image to its customers which [the employer] believes is beneficial to its business"); *Fagan v. National Cash Register Co.,* 481 F.2d 1115, 1124–25 (D.C.Cir.1973) ("Perhaps no facet of business life is more important than a company's place in public estimation ... we may take judicial notice of an employer's proper desire to achieve favorable acceptance.... Reasonable requirements in furtherance of that policy are an aspect of managerial responsibility.")

In short, the employer's decision to terminate Diggs was a legitimate business decision designed to preserve Pepsi's reputation and goodwill and to curtail customer complaints. Accordingly, I would find that Pepsi proved "just cause" for the discharge even if Diggs had proved the existence of a "just cause" contract.

"[T]he employer's prerogative to make independent, good faith judgments about employees is important in our free enterprise system." Blades, *Employment at Will v. Individual Freedom: On Limiting The Abusive Exercise of Employment Power,* 67 Colum.L.Rev. 1404, 1428 (1967). The Michigan courts have recognized this fundamental principle and have carefully refrained from extending the *Toussaint* decision to cover situations such as the one at bar. Because I believe the majority's disposition does not comport with applicable Michigan law and for the reasons articulated herein, I must respectfully dissent.

Although I do not find Pepsi liable for any damages and would reverse the judgment of the trial court and dismiss the appellee's complaint, I would concur in Judge Engel's disposition of the prejudgment interest issue. Judge Merritt's opinion argues that *American Anodco v. Reynolds Metals Co.,* 572 F.Supp. 895 (W.D.Mich.1983), *aff'd,* 743 F.2d 417 (6th Cir.1984) is inapposite—a conclusion that I, however, disagree with and cannot accept in light of *Anodco,* which requires future damages to be treated as a lump sum. As Judge Engel indicates, the *Anodco* decision clearly states that prejudgment "interest shall be calculated based on the *entire* damage award, which should not be apportioned." 572 F.Supp. at 896 (emphasis added). This analysis comports with established precedent in this circuit, which di-

rects that prejudgment interest should be calculated on the total amount of Diggs' wages, rather than on the present value.

The *Anodco* opinion clearly addressed not only the rate change issue, but also the issue of whether a damage award should be apportioned over the time period between the filing of the complaint and the entry of judgment. The court rejected "apportionment" in both contexts. 572 F.Supp. at 896, *aff'd*, 743 F.2d 417 (6th Cir.1983). Accordingly, I concur with Judge Engel's disposition of this issue.

Accordingly, I dissent from Parts I, II and III of the majority's opinion, but concur in Parts IV and V of the opinion, including Judge Engel's disposition of the prejudgment interest issue.