ISBELL *v.* ANDERSON CARRIAGE CO.

1. AMENDMENT—DECLARATION—ASSUMPSIT.

Upon the trial of an action for breach of a contract of agency for the sale of electric automobiles, the court was within its discretion in permitting an amendment to plaintiff's declaration so as to allege that defendant fraudulently canceled said contract, which, by its terms, was terminable by defendant, if it should become dissatisfied, although its officials had repeatedly expressed satisfaction with plain- tiff's performance; also an amendment increasing the claim of damages; defendant making no claim of surprise and not requiring further time in which to meet the facts so added.

2. CONTRACTS — PRINCIPAL AND AGENT — SATISFACTION — WORDS AND PHRASES.

The question of defendant's good faith in terminating plain- tiff's contract of agency, which provided that the plaintiff should conduct the agency satisfactorily to defendant, was properly submitted to the jury on testimony, disputed by de- fendant, that it was satisfied with plaintiff's efforts to perform and fraudulently exercised its option to annul the contract.

3. SAME—PERFORMANCE.

But it was entirely within defendant's judgment whether the acts done and performance attempted were in fact satisfac- tory, and the justice of such conclusion could not be inquired into by a jury.

4. SAME—TRIAL—EVIDENCE OF MOTIVE.

After the amendment allowed by the trial judge so as to have the declaration aver bad faith in claiming dissatisfaction with the attempted performance of the agency contract, de- fendant was entitled to recall its principal witness and show its good faith in canceling plaintiff's rights.

5. DAMAGES—PROSPECTIVE PROFITS—SPECULATIVE DAMAGES.

A verdict of $23,474.16 was excessive and improperly based on evidence of the prospective profits, which plaintiff claimed he might have made but for the wrongful termination of his contract for an automobile agency, where he had no estab- lished business in the machines which he purposed to sell and which had no market, being new and untried, and where the contract provided that defendant might terminate the . relation whenever it became dissatisfied.

Error to Wayne; Murfin, J.    Submitted January 15, 1912.    (Docket No. 59.)    Decided May 31, 1912.

Assumpsit by William G. Isbell against the Anderson Carriage Company for breach of a contract of agency. Judgment for plaintiff. Defendant brings error. Reversed.

*Geer, Williams, Martin & Butler*, for appellant.

*Lucking, Emmons & Helfman*, for appellee.

STEERE, J.    This action is brought by William G. Isbell against the Anderson Carriage Company to recover damages for the alleged breach, by wrongful termination, of a contract giving plaintiff and one George D. Grant the agency for sale of defendant's electric automobiles during a period of five years. . At the time of entering into said contract, the plaintiff and said Grant associated as partners in the enterprise, and, as parties of the second part, agreed by this contract to "establish the Anderson Electric Agency for the exclusive sale and care of the electric automobiles which are made by the first party."

Summarized, the terms of this agreement are: The manner of conducting the details of this agency are to be "such as will be at all times entirely satisfactory to the Anderson Carriage Company." At the time of the signing of the contract, the second parties shall place an order "for one Victoria top and one coupé top electric," the second parties to be entitled to a discount of 20 per cent. from the established price list of said Anderson Carriage Company on its electrics, to pay 25 per cent. on placing orders, the balance on delivery of the machines, first parties to refer all inquiries and intending purchasers to the Anderson Electric Agency, and to assist the sales of its electrics by giving personal attention to parties sending to its factory for that purpose. That out of town purchasers coming to Detroit shall have free and sufficient demon-

stration and examination of machines at their agency. That machines sold to W. C. Anderson, W. P. McFarlane, W. M. Locke, C. A. Newcomb, or W. Kritser will not be considered a violation of the contract. That said contract shall run for a period of five years, subject to the keeping of its terms as stated.

The principal contention in this case centers around the second paragraph of said contract, which is as follows:

"Second. It is agreed on the part of the second parties that the method of conducting said agency and the detailed care given to each of the Anderson machines which are sold shall be such as will be at all times entirely satisfactory to the Anderson Carriage Company, and the Anderson Carriage Company are to at all times have the privilege of properly investigating the methods which are used in the care and sale of their machines. It being understood that the business policy of such agency will be such as to build up and foster the sale and use of Anderson Electrics in the city of Detroit. This agency shall do business in a building that shall be satisfactory to the first parties and also maintain satisfactory storage and charging stations."

This contract is dated September 19, 1907, though the testimony tends to show that it was signed three or four days later. Within two days after signing the same the parties executed the following supplemental agreement:

"It is further understood and agreed that nothing contained in this contract, dated September 19, 1907, between the undersigned parties, to which this is attached and of which this forms a part, shall be construed as preventing, during the time in which such contract remains in force, the parties of the second part thereto from selling gasoline cars; but that the sale, at any time, of such cars by said parties of the second part is expressly allowed and is no infringement of such contract; and, further, that said parties of the second part may store and care for gasoline cars until such time as a sufficient number of electric cars is secured by them for storage purposes to occupy the storage capacity of their garage, the object of this being to give said second parties an opportunity to make their bus-

iness a paying enterprise. It is further understood and agreed that said first party shall give said second parties sixty days' notice to correct any error or mistake that may arise in carrying out the conditions outlined in paragraph two of said contract.

"THE ANDERSON CARRIAGE COMPANY,
"By W. C. ANDERSON, President.
"W. G. ISBELL.
"GEO. D. GRANT."

On August 6, 1908, said George D. Grant assigned to plaintiff all his right, title, and interest in the above contract.

It is the testimony of both parties that it was understood and agreed Isbell & Grant would supply a new garage in which to conduct the business. Before or contemporaneously with the signing of said contract, plaintiff entered into an agreement with one J. S. Farrand, Jr., for the erection of a garage at 730–732 Woodward avenue, in which to conduct the business contemplated by said contract with the Anderson Carriage Company, and leased the same for five years. The plans for said garage were submitted to Mr. Anderson, president and manager of defendant, who expressed himself entirely satisfied with them. Plaintiff further claims that it was understood and agreed by all parties concerned that temporarily during the time of the construction of the Farrand garage the business of this agency should be taken care of in Grant Bros'. garage. The Farrand garage was completed between the latter part of February and 15th of March, 1908. On September 24, 1907, pursuant to the contract, a Victoria top and a coupé top electric were purchased and $3,280 paid for the same by Isbell & Grant. They were also engaged in the sale of gasoline automobiles as contemplated in the supplemental contract.

On December 31, 1907, defendant served written notice on Isbell & Grant that they were not carrying out the contract in a manner satisfactory to it, naming 12 particulars in which it claimed their methods were not satisfactory or in accordance therewith, and giving notice that,

if they failed to correct these matters in a way satisfactory to defendant within 60 days, it would consider the contract canceled. The particulars named are as follows:

"(1) That your lack of advertising in the daily papers, through the mail, and by demonstration; (2) that your failure to employ proper salesman, manager, battery man, and man to wash, care, and charge machines; (3) that your method of caring for machines which have been left at your place for care; (4) that your method with reference to not being liberal enough in exchange deals; (5) that you fail to foster trade by co-operation with other garages and dealers in gasoline machines; (6) that your methods of having your telephone calls answered; (7) that the methods of Wm. G. Isbell in handling prospective buyers; (8) that your business policy and method in not placing orders with us for electrics in advance of sales being actually made; (9) that the method and business policy in not having our electrics in stock covering the various styles we make ready to deliver in the event of effecting a sale; (10) that the present appliances for charging electrics is not what it should be; (11) that you fail to put forth satisfactory efforts to sell our electrics; (12) that your business policy is not such as to foster the sale and use of Anderson electrics in the city of Detroit.

"In none of the above-mentioned ways are you giving satisfaction to us or keeping your contract."

Isbell & Grant replied, vigorously denying that the particulars named in the notice were borne out by the facts or they had failed to observe their contract, asserting their intention and desire to carry out its provisions. On March 2d following, the Anderson Carriage Company sent them written notice that, owing to their failure to carry out the conditions of the contract, "the same is hereby canceled." Plaintiff's original declaration alleges as breaches of this contract that defendant—

"Contriving to injure and deceive, * * * did not, nor would, sell its automobiles to said William G. Isbell and George D. Grant at the terms aforesaid, but afterwards, and at the beginning of the season in which the sale of defendant's machines would be the most profitable, * * * to wit, on March 2, A. D. 1908, refused to sell

any of said automobiles or parts thereof to said William G. Isbell and George D. Grant, although often requested so to do, and * * * did not, nor would, give them the exclusive sale of said automobiles or parts thereof for the time stipulated, but, on the contrary, * * * said defendant frequently and continuously sold said defendant's machines and manufactures to divers persons other than the said William G. Isbell and George D. Grant, in violation of its agreement, * * * " to plaintiff's damage $20,000.

On December 20, 1910, during the progress of the trial, amendments to plaintiff's declaration were filed by leave of the court, and against defendant's objection, enlarging the *ad damnum* clause to $100,000 and adding a third count, as follows:

"And plaintiff further avers that defendant was not at any time in good faith and honestly dissatisfied with any of the actings or doings of the said Grant and Isbell, or of either of them, in the performance of the said contract, and that the said plaintiff had repeatedly expressed its satisfaction therewith, but that on, to wit, March 2, 1908, with fraudulent, surreptitious and ulterior design to cancel the said contract and to be freed of the duties and obligations therein imposed upon the said defendant, and to unlawfully and fraudulently make other arrangements in relation to the sale of its said cars which should be more profitable, the said defendant did on said date cancel said contract."

Error is alleged on the ruling of the court in allowing the amendment. No claim was made by counsel of surprise, nor request for delay, and we think it was not an abuse of discretion for the court to allow the amendment under the authority conferred by section 10268, 3 Comp. Laws. Defendant pleaded the general issue. The cause was tried before a jury in Wayne circuit, resulting in a judgment for $23,474.16.

Subsequently defendant moved the court to set aside the judgment and grant a new trial, which motion was denied. When this contract was canceled, it had been in effect over five months. Isbell & Grant had sold one of

the two machines bought when said contract was entered into, and had ordered no more. Prior to the date of the contract, defendant had sold but one of its electric automobiles in Detroit. It had previously been engaged in the manufacture of carriages, and first put its automobiles on the market in 1907. They were new and practically unknown, and were entering the field to compete with older and well-established cars.

It is the claim of plaintiff that it was well understood between the parties that the enterprise was in a formative period under adverse circumstances, at a time of business depression, in the fall and winter, an inopportune time for sales, striving to introduce a new car on the market in competition with well-known and popular cars; that the business of conducting and developing the agency was entered upon and faithfully followed out according to the terms of the contract and mutual plans of endeavor subsequently agreed upon, and approved by Mr. Anderson, manager of defendant, with whom almost daily consultations were held; that they occupied their time in talking the car to citizens and demonstrating it, interviewing prospective customers, advertising, and by other efforts laying the foundation for future sales, at the same time planning a more extensive campaign of advertising and active solicitation to introduce the car to the trade, when the new garage was completed, which had been mutually agreed upon as an opportune time, with all of which, as done and disclosed, and with the general method followed, Anderson, from time to time, had expressed entire satisfaction, until he surreptitiously entered into negotiations with another selling agency, called the Standard Auto Company, to take the business on a commission more advantageous to defendant, whereupon the first notice of December 31, 1907, was served, further consultation refused, and all co-operation withdrawn by defendant.

On the other hand, it is claimed by defendant that the agency was not properly conducted and pushed; that the methods pursued were not satisfactory; that Anderson,

while he protested repeatedly and urged them to change their methods, nevertheless endeavored in good faith to aid and encourage them by sending prospective customers and advising as to the policy; but they were dilatory and neglectful, were not doing sufficient advertising and exhibiting, bought no more cars after they sold the only one they did sell, did not employ a competent salesman or properly care for the automobiles, and in various other ways, as specified in the notice given, failed to carry on the business of the agency satisfactorily or in a manner which portended ultimate success; that he did not tell them he was satisfied with their methods, but directly to the contrary; that he did not cancel the contract because others would take the agency on a lower commission, but because their methods were unsuccessful and unsatisfactory and their agency a failure.

In the details of this controversy abundant issues of fact were presented by the conflicting testimony, the import and competency of much of which are contingent, in many respects, on a proper construction of the contract the parties entered into. On the trial it was claimed by plaintiff that the reasonableness, honesty, and motives of defendant in declaring dissatisfaction were open to inquiry and attack; that the dissatisfaction must be honestly entertained, and, if it was feigned or in bad faith, for some ulterior purpose, it would be no defense. The trial court admitted testimony offered by plaintiff bearing upon this question and submitted the same to the jury as an issue of fact, giving the following instruction:

" You will bear in mind that it is the claim of the plaintiff in this case that they really were satisfied, that they frequently expressed satisfaction, and it is the plaintiff's claim that this is merely a subterfuge, an evasion, if you please, to express a dissatisfaction surreptitiously and improperly, taking advantage of this clause in the contract that they might be relieved of its obligation. So, that, gentlemen of the jury, is the primary issue for you to determine—not whether or not they had grounds for dissatisfaction, but were they in truth and fact dissatisfied.

For, under the testimony and the facts as developed in this case, if they were .dissatisfied, this plaintiff has no cause of action. But if, on the other hand, the defendants were satisfied, and simply claimed a dissatisfaction as a subterfuge by way of an evasion, not in good faith, but solely to be relieved of the obligation of the contract, then and in that case this plaintiff is entitled to recover."

It is urged by defendant that, under the express provisions of the contract, it had the right to terminate the same at any time on the ground of dissatisfaction, that the reasonableness or justice of such dissatisfaction could not be inquired into, nor was defendant's good faith and sincerity in such action a proper subject for investigation   Therefore all testimony in relation to such issues was erroneously admitted, and those questions improperly submitted to the jury.

Contracts of this general character, known as " satisfaction contracts," in which one party agrees to perform his part to the satisfaction of the opposite party, are fruitful and frequent sources of litigation, owing to the disappointments they so often bring to the party who has taken the chance of performing satisfactorily, and the difficulty of ascertaining what really constitutes satisfaction, which primarily is but a mental process. Such contracts are enforceable, however, to the extent the intention of the contracting parties can be ascertained. If parties voluntarily assume the obligations and hazards of a satisfaction contract, their legal rights are to be determined and adjudicated according to its provisions. It is elementary that courts cannot make contracts for parties nor relieve them of the consequences of their contracts, however ill-advised.

In many cases of this nature which have been before various tribunals, there is recognized two quite well-defined classes—one where the personal taste, feeling, sensibility, fancy, or individual judgment of the party to be satisfied are especially involved; the other where mechanical utility or operative fitness in relation to which some

standard is available are bargained for. In the former class the authorities preclude disputing the propriety or reasonableness of the declaration of dissatisfaction on the part of the individual entitled to exercise it. It is said to be with him purely a personal matter of which he is made the sole judge. It being his right to say whether he is satisfied or not, it cannot be left to another to say that he ought to be satisfied.

In the latter class of cases the authorities are more conflicting. In numerous decisions it has been held, under the phraseology of the contracts being considered and the attending circumstances, that not only the honesty of the declared dissatisfaction may be questioned, but even, in special instances, the adequacy and reasonableness of the ground for such action are open to investigation. *Wood Machine Co.* v. *Smith,* 50 Mich. 565 (15 N. W. 906, 45 Am. Rep. 57). We think the contract under consideration falls more closely within the former class. It was an agency in the nature of employment to render services involving something more than the operative fitness or mechanical utility of a tangible thing. It involved personal efficiency, energy, initiative, business experience and ability to formulate methods and make them successful, as well as co-operation and confidential relations with defendant, of such a character as to lead to the conclusion that the parties contemplated, and provided for, the right of defendant to terminate the relationship when, according to its own fancy and judgment, the work done and methods pursued were not satisfactory. In *Tyler* v. *Ames,* 6 Lans. (N. Y.) 280, it was said of an agent hired to sell engines for one year if he could do the work "satisfactorily:"

"The right of determining whether the plaintiff filled the place of agent satisfactorily must, from the nature and necessity of the case, belong to the person whose interests are directly affected by the plaintiff's action. To require the employer, under such a contract, to prove that plaintiff did not fill the place satisfactorily, would be to

require of him an impossibility, unless his own oath was taken as to his mental status on the subject. If he is required to prove facts and circumstances that would justify him in feeling dissatisfied with the manner plaintiff filled his office, it would be annulling this clause of the contract, as, without such a clause, he would have the right to dismiss the plaintiff if he did not properly perform his duties."

In *Koehler* v. *Buhl*, 94 Mich. 500 (54 N. W. 159), this court said:

"It is settled law that, where a person contracts to do work to the satisfaction of his employer, the employer is the judge, and the question of the reasonableness of his judgment is not a question for the jury."

In *Sax* v. *Railway Co.*, 125 Mich. 252 (84 N. W. 314, 84 Am. St. Rep. 572):

"Under the rule as settled in this State, the reasons for, or justice of, the defendant's satisfaction, cannot be inquired into"—citing numerous cases.

Though this is the law, it is also well settled that, if the dissatisfaction claimed is shown to be insincere, in bad faith, dishonest, or fraudulently set up as a subterfuge, it will be no defense. 9 Cyc. p. 624; 3 Page on Contracts, § 1390; *Philadelphia, etc., R. Co.* v. *Howard*, 54 U. S. 308. In *Brucker* v. *Railroad Co.*, 166 Mich. 330 (130 N. W. 822), plaintiff sued to recover for wrongful cancellation of a contract for grading, in which it was provided that, if the work was not done satisfactorily to defendant or its engineer, defendant could take over the work. In sustaining the contention of plaintiff on a proposition analogous to the one now under consideration, this court said:

"The power to terminate a contract must be exercised in good faith, but the burden is upon the contractor to show a fraudulent exercise of the reserved power. While the construction of the contract was a question of law, the conduct of the defendant in taking over the work is open to the jury upon the question of fraud and bad faith, and we think there was evidence from which it may have been inferable."

The issue was raised in this case by plaintiff's amended declaration. To maintain it, plaintiff introduced evidence of repeated expressions of approval and satisfaction, by Anderson, as to what was done and the general method of conducting the business up to the time the notice of December 31st was served and of refusal to confer or co-operate thereafter, of dealings by defendant with others which resulted in a contract giving them the agency on better terms for defendant, before the 60 days specified in the contract and notice had expired.

While the provision found in the supplemental contract, that 60 days' notice shall be given to correct any error or mistake that may arise in carrying out the conditions outlined in paragraph number two of said contract, is somewhat obscure and does little to illuminate the doubtful portions of the paragraph referred to, it does make plain that, when dissatisfaction first arises, another chance will be given during a period of 60 days to make things satisfactory before a final decision is reached. Good faith and an honest compliance with this require that during the 60 days defendant shall reserve judgment, remain in a receptive mood, and be ready and willing to co-operate and approve it, if possible, to the end that the contract may continue if the causes of dissatisfaction shall be in truth removed. In *Gwynn* v. *Hitchner*, 67 N. J. Law, 654 (52 Atl. 997), where a color mixer hired to work to the satisfaction of his employers was discharged, and the question of good faith was raised, the court said:

" But, as men are always acting and talking, their acts and words continually afford material from which rational inferences may be drawn as to the mental state and attitude of the actor and speaker."

We think there was evidence in this case as to what was said and done by defendant's manager which authorized the action of the trial court in submitting the question of bad faith to the jury.

Plaintiff's amendment to his declaration, charging bad

faith, was filed and served upon opposite counsel during the progress of the trial and after Anderson had been on the stand as a witness. He was recalled to be interrogated specifically as to the allegations in the amendment directed against his good faith and honesty of purpose. This was not allowed. The following occurred:

"By Mr. Geer (stating some matters alleged in the amended declaration): I want to ask you whether or not—

"*Mr. Emmons:* I object to that.

"*The Court:* I sustain the objection. You need not go any farther with that. * * *

"*Q.* I will ask you this question: Whether or not, in declaring that contract forfeited, you acted in good faith. (Objected to. Excluded. Exception taken.)

"*Q.* Did you cancel that contract for the purpose of making another contract thereby expecting to obtain better conditions?

"*The Court:* (To the witness): Stand down; that is enough of this. It has all been gone over on direct examination."

At the time of witness' previous examination, the amended declaration had not been filed or served, and these specific questions had not been asked. This important issue was largely one of mental status. Purpose, motive, and intent were involved, and defendant was entitled to make full and direct inquiry along those lines.

"It has become the settled law in this State that in cases where intent or motive are involved in the issue, the person to whom such intent or motive is imputed is a competent witness to testify in regard thereto." *Spalding* v. *Lowe*, 56 Mich. 366 (23 N. W. 46).

"When the only person who knows the fact (what his intentions were) is accessible as a witness, his answer must necessarily be more direct evidence than any other; and, if there is any reason to suspect his candor, the jury can make all the allowances called for by his position and demeanor." *Watkins* v. *Wallace*, 19 Mich. 57.

The evidence offered was admissible and its rejection erroneous.

It is also the opinion of this court that the verdict is excessive. It was manifestly awarded on the theory of prospective profits covering the balance of the five-year period mentioned in the contract, and based on sales made by defendant after it took over the business. During the five and one-half months Isbell & Grant had the agency, they were also engaged in other business, selling gasoline cars. They devoted but a part of their time and expended but little money on the agency while they had it. They hired little help, and did comparatively little advertising. They sold one car.

Conceding all that is claimed as to their reasons, methods, efforts, plans, and purposes while they had the business, it was not yet successful or profitable. When their contract was canceled (and, in effect, 60 days before, when the first notice was served on them), their efforts ceased, and they were free to devote themselves to other avocations. From March 2, 1908, when the contract was canceled, to December 16, 1910, when this case was tried, defendant had sold 207 cars at an alleged profit to its selling department of $15,000. This was the result of a vigorous campaign, instituted at heavy expense to introduce, and develop a market for, its output, which was of vital importance, for its very existence as a manufacturing institution and previous investments in that connection were staked on a market for what it manufactured. Two large and expensive garages were built and from three to five salesmen were employed, from $300 to $500 per week was expended in advertising, and a force of over 30 men kept to care for customers' cars, and do other work in that connection. Progressive methods were adopted and pushed on a comprehensive and liberal scale.

There is no proof or presumption that Isbell & Grant would have been able to do all these things, or could have as successfully managed the business and worked up a market for the car. This was not a case of infringing on an old established business. It was building up a new business where none existed. Prospective profits on an

established business can often be estimated in the light of the past with a reasonable degree of certainty; but a new business is in the realm of uncertainty and conjecture. It has sometimes been stated as a rule of law that prospective profits are so speculative and uncertain that they cannot be recognized in the measure of damages. This is not because they are profits, but because they are so often not susceptible of proof to a reasonable degree of certainty. Where the proof is available, prospective profits may be recovered, when proven, as other damages. But the jury cannot be asked to guess. They are to try the case upon evidence, not upon conjecture.

This contract was for a commercial agency to sell a commodity for which there was no established market—an experiment which, by the terms of the contract and surrounding circumstances, embodied more elements of uncertainty than are often found in combination. The contract did not specify an amount of work to be done at a fixed price, nor designate in detail the methods of doing business, but did require they should be satisfactory to defendant. Isbell & Grant in express terms were not required to sell any special number of cars, or, in fact, any cars at all. The contract was liable to be terminated at any time on 60 days' notice. To reach the verdict rendered, the jury necessarily assumed, and found as facts, that the agency would have remained satisfactory to the defendant, and that the contract would have continued in full force for five years; that Isbell & Grant would have expended as much money, employed as much and as good help, constructed as many and as large garages, pursued as effective methods and developed the business as successfully as defendant had done. This was all in the realm of conjecture. In *Dowagiac Manfg. Co.* v. *Corbit*, 127 Mich. 473 (86 N. W. 954, 87 N. W. 886), this court said:

"The sale of a given piece of machinery in a new territory, where its merits or demerits are not known, depends

upon so many contingencies that no one can speak with any reasonable certainty of how many will be sold by a given firm in a given time. Any attempt to fix the number of sales would be mere guesswork, and is too speculative to form a safe basis upon which to compute damages."

Plaintiff's counsel claim this case is controlled by *Schiffman* v. *Peerless Motor Car Co.*, 13 Cal. App. 600 (110 Pac. 460), and *Mueller* v. *Mineral Spring Co.*, 88 Mich. 390 (50 N. W. 319). The first mentioned is a case in which plaintiff recovered from defendant commissions on cars sold in his territory in violation of a contract for exclusive agency. In that case plaintiff had an established, going business, running an automobile agency in Los Angeles, Cal., with a contract of exclusive agency for a definite period, by which he agreed to purchase and sell a fixed number of defendant's motors in a fixed territory. The contract contained no satisfaction clause under which defendant might prematurely terminate it. Defendant was engaged in manufacturing automobiles in Toledo, Ohio. It failed to fill plaintiff's orders for cars, for which he had a market, and surreptitiously invaded his territory while his contract was in force, and while he was complying with all its requirements, and sold certain of its cars in violation of the contract. Each sale was an infringement on an existing contract, and he was held entitled to his commission on each car so sold. It was an established business with an established market for a well-known commodity for a fixed period. In *Mueller* v. *Mineral Spring Co., supra,* plaintiff, a druggist in Detroit, had a contract for a year giving him the exclusive agency in that city for the sale of defendant's Bethesda mineral spring water, a well-known commodity having an established market. He had been selling it for a year before entering into the contract in question. Before the expiration of the contract defendant canceled it and appointed another agent in Detroit, who took the going business up where plaintiff left off, and enjoyed the estab-

lished trade for five months before plaintiff's contract expired. Plaintiff was allowed to prove the sales made during the five months, in connection with other evidence as to the nature, amount, and profits of the business. That was also a case of a fixed contract for a definite period to continue an old established business in the sale of a well-known commodity for which there was an established market. These cases are not tinctured with the uncertainties and infirmities surrounding the contract in question, and are not controlling. The underlying principle which marks the distinction is suggested in *Sax* v. *Railway Co.*, 129 Mich. 502 (89 N. W. 368), which was a case involving employment so long as plaintiff's conduct and services were satisfactory. This court there said:

"In order to reach a verdict, it was necessary for the jury to fix the time when the contract would be terminated. That being fixed, and his age and monthly wage being found, the present value of his services could be determined. The jury must then determine the time of the interruption, and the difference between the two amounts would be the amount of the judgment. Upon no other theory can the verdict be sustained. But the record contains no evidence upon these points, and, in the very nature of things, none could be produced. There is no foundation for even a guess by a jury upon either question of fact, because either could terminate the contract at will, and it was equally impossible to tell how much of the time he would be employed. The jury were turned loose into a field of pure speculation and conjecture, without any practical or tangible basis upon which to assess damages. Under such circumstances none can be assessed"—citing numerous cases.

In the case at bar, in order for the jury to reach a verdict, it was necessary for them to fix a time when the contract would terminate, and they were so instructed by the trial judge. They apparently did fix it at five years, but there was no foundation for even a guess upon that question of fact, because by its terms the defendant could terminate it on 60 days' notice, at any time it was honestly dissatisfied with the method of conducting the business;

and their conclusions that Isbell & Grant would have made equal expenditures, shown equal energy and ability, and adopted equally successful methods in developing a new business with equal profit, have no tangible basis of probative facts, and are but conjecture and surmise. Under an executory "satisfaction contract" of this nature, for an uncertain undertaking to develop a new and untried business, and build up a market for a new and unknown commodity, future profits are too speculative, contingent, and uncertain of ascertainment to be a measure of damages in the absence of definite stipulation therefor.

This contract was canceled, whether rightfully or wrongfully, at the expiration of five and one-half months. For that period it was executed. The balance of the time it might have run it was executory. Both parties treated it as ended, and made no further attempt to carry out its provisions. So far as it was executed, if wrongfully canceled, plaintiff is entitled to recover for all losses sustained in its execution and all benefits conferred on defendant, including time devoted to it, work done, obligations incurred, or money properly expended for labor, machinery, supplies, or building, and all other proper damages for breach of an executed contract, to be ascertained and determined according to the facts proven.

Judgment is reversed, and a new trial ordered

MOORE, C. J., and MCALVAY, BROOKE, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.