# STATE OF MICHIGAN

# COURT OF APPEALS

JOHNSON CONTROLS, INC., and JCIM, LLC,

        Plaintiffs/Counter-Defendants-
        Appellees,

v

ATLANTIC AUTOMOTIVE COMPONENTS,
LLC,

        Defendant/Counter-Plaintiff-
        Appellant.

UNPUBLISHED
October 13, 2015

No. 321172
Wayne Circuit Court
LC No. 09-014595-CZ

Before: BORRELLO, P.J., and JANSEN and OWENS, JJ.

PER CURIAM.

Defendant appeals as of right from the trial court's final judgment in favor of plaintiffs with respect to plaintiffs' claims of claim and delivery and breach of contract and awarding plaintiffs damages in the amount of $61,648 and prejudgment interest in the amount of $6,138. The trial court also found no cause of action with respect to plaintiffs' claims of negligent misrepresentation, innocent misrepresentation, and common law and statutory conversion, as well as to defendant's counterclaim for breach of contract, statutory conversion, and unjust enrichment. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Ford Motor Company, an original equipment manufacturer (OEM), entered into an agreement with tier-1 supplier Visteon for the production of the door trim panels (door substrates and map pockets) for the Ford heavy duty truck series known as the P356 program. Visteon in turn outsourced the molding of the parts for the P356 program to defendant, a tier-2 supplier in which Visteon had a 70% interest, following a competitive bid process. Defendant invested approximately $11 million as a result of its agreement with Visteon, including expansion of its building, the purchase of four new machines, and other various costs related to the program. Defendant amortized these costs in the piece price negotiated with Visteon.

Before defendant's first shipment of parts, Ford re-sourced the tier-1 business from Visteon to a Ford subsidiary, Automotive Components Holdings (ACH). Defendant's tier-2 supply agreement remained in effect, and ACH issued purchase orders to defendant under the

same terms that had existed with Visteon. Defendant began shipping parts from its facility in Benton Harbor to the ACH facility in Utica in January 2007.

Ford shut down ACH's Utica plant sometime in 2007 and subsequently chose plaintiff, Johnson Controls, Inc. (JCI), to replace ACH as the tier-1 supplier of the P356[1] door trim panels. JCI and defendant entered into a new supply agreement on May 25, 2007, with defendant as "the sole production source for the following parts on the Ford P356 program, anticipated to transfer to JCI on September 10, 2007 and to continue for the length of the program design life, expected to be 2.5 years, at the prices stated below."[2] JCI reserved the right to cancel the agreement at any time "if any of the following do not occur":

- Atlantic submission, and Johnson Controls acceptance, of a full piece price and tooling breakdown to include material, labor, burden, SG&A, profit, and any other detail information requested by JCI within two weeks of the date of this letter.

- A successful audit and approval of piece price and tooling. JCI reserves the right to audit all tools and invoices. World market pricing will influence supplier reimbursement for all tooling, gages and equipment.

- Our mutual agreement and execution of a detailed Supplier Statement of Work as requested by Johnson Controls.

- Johnson Controls' continuing satisfaction with Atlantic's quality, delivery, meeting of program milestones, service and price-competitiveness. Johnson Controls may re-source part or all of prototype or production supply, as deemed appropriate in its sole discretion, if these conditions are not met.

JCI provided a supplier cost breakdown sheet and supplier statement of work for defendant to fill out. The supplier cost breakdown sheet included a line item for "special amortizations" with examples such as "for equipment, tooling, R&D, gages."[3] The supplier cost breakdown sheet and supplier statement of work returned to JCI did not identify any amortized costs in the piece price.

JCI conducted a process audit at defendant's facility in February 2008. The audit revealed faster cycle times, lower part weights, and the use of less colorant and less resin than had been quoted to JCI by defendant, each of which would result in a lower piece price. JCI

---

[1] Ford entered into a separate supply agreement with JCI for the P473 program, which was the successor to the P356 program.

[2] The prices were those negotiated in the contract between Visteon and defendant.

[3] JCI had also informed defendant by email correspondence that it needed "the total amortized amount that was agreed upon with Ford and the cost per piece that is added in the piece price."

calculated that the differences resulted in a $600,000 overcharge in piece price annually. JCI expressed to defendant its lack of satisfaction with the audit results and engaged in discussions with defendant about price concessions. Defendant agreed only to reduce the piece price an additional one percent annually, which would have absorbed $98,000 of the overcharge annually. JCI and defendant never came to a mutual agreement on the issue of price concessions.

JCI, under pressure from Ford to find ways to reduce costs across all of its projects, engaged in a "make vs buy" analysis in January 2009 to determine if it would be more cost effective to purchase the P356 program parts from defendant or to manufacture the parts in-house.[4] JCI determined that it could make the parts for less cost than what they were paying for the parts from defendant and that JCI could save $2.9 million annually. JCI intended to wait to insource the production of the parts until the P356 program ended and the P473 program commenced.[5]

In the meantime, JCI was experiencing quality issues with parts it was receiving from defendant. Representatives of both JCI and defendant acknowledged that three quality issues existed as early as 2008 involving short shots, missing heat stake bar bosses, and excess material at the gate. JCI had issued supplier material rejection reports to defendant regarding these defects and, because the corrective action taken by defendant did not resolve the issues, JCI initiated management quality review meetings on March 19 and April 19, 2009.[6] In each of those months, defendant issued return material authorizations for defective parts that defendant had shipped to JCI. Following the April meeting, defendant implemented third-party containment[7] because a pronounced level of defective parts was being produced as of April 23, 2009. According to JCI's corporate director of supplier quality for plastics, defendant's parts per million (PPM)[8] exceeded the standard set by JCI in 2007, 2008, and 2009.

---

[4] In 2007 or 2008, JCI had previously considered insourcing the P356 program parts produced by defendant, but JCI lacked the building capacity to house the tools required to produce the parts. According to JCI, it had resisted Ford's pressure to cut costs by insourcing the parts prior to the termination of the P356 program. JCI had purchased a facility in 2009 in Louisville, Kentucky, and had closed its Bardstown facility and relocated to Louisville as Johnson Controls Interiors Manufacturing, or "JCIM." The Louisville facility provided the additional capacity that JCI would need in order to insource production of the parts that were being produced by defendant.

[5] The P473 program used the same door substrates and map pockets that were used for the P356 program.

[6] The March meeting was an MQR 2 meeting, meaning that corrective actions put in place following an MQR 1 meeting were not effective. The April meeting was an MQR 3 meeting, meaning that a defective product from a supplier had made it through to the OEM.

[7] Containment is an added inspection by an independent person of 100 percent of the parts being produced.

[8] PPM is the number of defective parts per million produced and is utilized to gauge a supplier's performance.

JCI terminated the supply agreement with defendant on May 4, 2009, "due to breach." The termination letter from JCI to defendant stated:

> Representatives of Johnson Controls and JCIM, LLC met with representatives of Atlantic in March regarding Atlantic's failure to deliver products that meet Johnson Controls and JCIM specifications. Because Atlantic is still providing products to Johnson Controls and JCIM that do not meet required specifications, this letter is notice to Atlantic of termination by Johnson Controls and JCIM of their contracts with Atlantic for the parts supplied to Johnson Controls and JCIM relating to the Ford P356 and Chrysler LC-22 vehicle programs.

> The termination of these contracts is effectively immediately. However, Johnson Controls and JCIM require that Atlantic continue producing these parts as necessary to allow Johnson Controls and JCIM to transition production to a new supplier as permitted by the Terms and Conditions applicable to your contracts. We expect that this transition will be completed no later than July 31, 2009.

Defendant prepared a cancellation cost analysis as a result of the termination of the P356 supply agreement. JCI did not learn until receipt of the cancellation claim that defendant had been amortizing $11 million in start-up costs in the piece price of the parts it was producing for JCI.

JCI demanded that defendant allow it access to defendant's facility in order to retrieve the tools defendant had used to produce the parts for the P356 program. Defendant refused to relinquish the tools, asserting that defendant had the right to continue to produce the parts and that JCI owed defendant more than $1 million for parts that defendant had already delivered to JCI. On June 12, 2009, JCI filed a complaint for claim and delivery in which it alleged that it had the contractual right to terminate the supply agreement and take possession of the Ford parts tools, as well as a motion for possession pending final judgment in which it sought immediate possession of the tools. The trial court entered an order granting JCI's motion, but ordered that JCI post a cash bond in the amount of $600,000 pursuant to the molder's lien act as a precondition to recovering the tools. JCI took possession of the tools on July 17, 2009. Defendant continued to provide parts to JCI from its "bank" through August 2009.

On October 8, 2009, defendant filed a counterclaim alleging that JCI's termination of the supply agreement was a breach of contract, that JCI's taking possession of the tools constituted conversion, and that JCI had been unjustly enriched through its receipt of goods and services from defendant. Defendant asserted that JCI's purported reason for termination of the supply agreement was a pretext and that JCI terminated the contract so that it could produce the P356 program parts in-house to save costs. Plaintiffs thereafter filed an amended complaint asserting an additional claim for breach of contract. Plaintiffs claimed that defendant had failed to disclose that it had amortized $11 million in start-up costs in the piece price and that JCI had been systematically overcharged approximately $1.4 million for the parts defendant had produced for the P356 program.

After a bench trial, the court found, in part:

-4-

Based on examination of all the evidence, the exhibits and testimony of the witnesses the Courts finds:  (i) Atlantic breached the contract with JCI based on the quality of the part it produced, the results of JCI's audit, and Atlantic's failure to disclose costs and fees in compliance with the contract.  (ii) JCI is entitled to terminate the contract for Atlantic's breach of contract but the Court awards no money damages as the piece price was agreed to by the parties and termination was JCI's sole remedy under the contract.  (iii) Atlantic's refusal to return the tools to JCI (claim and delivery), as set forth below, is a breach of contract with JCI, and JCI is awarded costs and fees for that breach.  (iv) The Court finds no cause of action on JCI's claims of misrepresentation (negligent and innocent), and conversion, both common law and statutory.  (v) The Court finds no cause of action on Atlantic's counterclaim of breach of contract, conversion and unjust enrichment.

## II.  JURY TRIAL WAIVER

On September 11, 2011, JCI filed a motion to strike defendant's jury demand.  JCI argued that both JCI's and JCIM's terms and conditions of purchase, both dated June 2008, contained a jury waiver and both were incorporated into the supply agreement between JCI and defendant.  Defendant asserted that the supply agreement incorporated only JCI's global terms and conditions of purchase that existed at the time the supply agreement was executed, and that these terms and conditions of purchase did not contain a jury waiver.  Defendant also argued that it did not and could not have voluntarily waived its right to a jury trial by operation of JCIM's terms and conditions of purchase because JCIM was not a party to the supply agreement.  The trial court granted JCI's motion to strike, finding that the supply agreement expressly incorporated the 2007 JCI global terms and conditions, which specifically stated that future amendments to the terms and conditions of purchase would govern any purchase orders issued after such amendments.  Whether a party waives the right to a jury trial in a contract presents a question of law that is reviewed de novo.  See *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 353; 596 NW2d 190 (1999).

Defendant argues that the jury waiver provision in both the 2008 JCI terms and conditions and the 2008 JCIM terms and conditions do not apply because the supply agreement incorporated only the 2007 JCI global terms and conditions and these are the terms and conditions to which defendant agreed at the time it entered into the supply agreement.  This issue is a question of contract interpretation.  "The primary goal in the construction or interpretation of any contract is to honor the intent of the parties."  *Rasheed v Chrysler Corp*, 445 Mich 109, 127 n 28; 517 NW2d 19 (1994).  To do this, courts apply the plain meaning of the words the parties used in a written agreement.  *Dillon v DeNooyer Chevrolet Geo*, 217 Mich App 163, 166; 550 NW2d 846 (1996).  Where a contract's language is unambiguous, this Court must interpret and enforce the contract as written.  *In re Smith Trust*, 274 Mich App 283, 285; 731 NW2d 810 (2007).

There is no dispute that the May 25, 2007 supply agreement for the P356 program is the basis of the parties' contractual relationship.  The agreement provides, "This is not an order for goods or services.  No production, preparation or investment may begin except as stated in a

signed purchase order issued by Johnson Controls." The agreement also provides, in relevant part:

> The parties' entire relationship and any purchase order(s) issued by Johnson Controls in connection with this program will be governed exclusively by Johnson Controls' Global Terms and Conditions of Purchase and any expressly applicable Country Supplement(s) (all available at . . ., except as modified by this letter. All others terms are rejected.

At the time the supply agreement was executed, JCI's global terms and conditions of purchase contained an arbitration provision, but did not contain a jury waiver. The global terms and conditions also provided that "[b]uyer may modify these Terms with respect to future Orders at any time by posting revised terms to its website at . . . , and such revised Terms will apply to all Orders issued thereafter." JCI revised its terms and conditions of purchase on June 1, 2008. The revised terms and conditions contained an arbitration provision, and also contained a waiver of jury trial that provided:

> <u>Waiver of Jury Trial</u>. BUYER AND SELLER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF BUYER AND SELLER, AFTER CONSULTING (OR HAVING THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO ANY ORDER OR OTHER DOCUMENT PERTAINING TO ANY ORDER.

The terms and conditions of purchase also provided that "[b]uyer may modify purchase order terms and conditions from time to time by posting revised purchase order terms and conditions to Buyer's internet website . . . Seller shall be responsible to review Buyer's website periodically."

Both the 2007 and 2008 JCI terms and conditions of purchase define "buyer" as the "subsidiary or affiliate of Johnson Controls, Inc. identified in the Order; if no such entity is identified, the Buyer is Johnson Controls, Inc." Thus, both the 2007 and 2008 JCI terms and conditions expressly state that purchase orders may be issued by affiliate entities. There is no dispute that JCIM is partly owned by JCI and, therefore, JCIM is at least an affiliate of JCI. On April 2, 2009, JCIM issued the relevant purchase order to defendant. The purchase order provided, "This purchase order is governed exclusively by JCIM, LCC terms of purchase available at . . . and incorporated here by reference, except as modified therein."[9] The JCIM terms of purchase are identical to the 2008 JCI terms of purchase, and contained the identical waiver of jury trial. The trial court properly relied upon the JCIM terms and conditions in upholding the jury waiver.

---

[9] There is no dispute that defendant accepted the purchase order and shipped against it.

Even assuming, as defendant argues, that the JCI terms and conditions apply and that defendant could not be bound by JCIM's terms and conditions because JCIM was not a party to the supply agreement, the supply agreement expressly incorporated the JCI 2007 terms and conditions. The 2007 terms and conditions specifically stated that future amendments to the terms and conditions would govern any purchase orders issued after such amendments. Accordingly, defendant agreed at the time of the contract that JCI had discretion to modify the terms and conditions in the future and that any modification of the terms and conditions would apply to purchase orders issued after the date of the modification. JCI amended its terms and conditions in June 2008, and those terms and conditions expressly provided a jury waiver. Consequently, defendant waived its purported right to a jury trial under the 2008 JCI terms and conditions.

Defendant argues that it did not knowingly and voluntarily waive its right to trial by jury when it agreed to be governed by modified terms and conditions of purchase. However, even the 2007 JCI global terms and condition of purchase contain an express provision requiring arbitration at JCI's election. Because defendant agreed to the arbitration provision, defendant could not have expected that any claim for money damages would be asserted in court, must less decided by a jury. See, e.g., *Burden v Check into Cash of Kentucky, LLC*, 267 F3d 483, 492 (CA 6, 2001) ("[T]he loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate" (citation omitted). Thus, we reject defendant's assertion that it did not knowingly and willingly waive its right to a jury trial.

## III. THE SUPPLY AGREEMENT

### A. THE FORD P356 PROGRAM SUPPLY AGREEMENT

Defendant argues that the trial court erred by finding that the supply agreement was a satisfaction contract that could be terminated in JCI's sole discretion as long as the termination decision was not made in bad faith. It contends that the supply agreement was a requirements contract for the sale of goods under the Uniform Commercial Code and obligated JCI to purchase its requirements for the P356 program from defendant for the production and service life of the parts. We review de novo questions of contract interpretation and considerations regarding the legal effect of a contractual provision. *Alpha Capital Mgt, Inc v Rentenbach,* 287 Mich App 589, 611; 792 NW2d 344 (2010).

The plain and express language of the supply agreement provided that the agreement may be canceled by JCI at any time if, among other things, JCI did not have "continuing satisfaction with Atlantic's quality, delivery, meeting of program milestones, service and price-competitiveness." Contracts in which one party agrees to perform his part to the satisfaction of the opposite party are known as "satisfaction contracts." *Isbell v Anderson Carriage Co*, 170 Mich App 304, 312; 136 NW 457 (1912). The trial court properly construed the supply agreement to be a satisfaction contract.

Defendant further argues that the trial court erred in determining the type of satisfaction contract created by the supply agreement. This state's courts have categorized contracts that are premised on the satisfaction of one of the parties into two types. The first type is where satisfaction is dependent on the personal taste, feeling or individual judgment of the party to be

satisfied. *Isbell*, 170 Mich at 312. The second type is where "mechanical utility or operative fitness in relation to which some standard is available are bargained for." *Id.* at 312-313. Where the contract is of the former type, the reasonableness or justice of the party's dissatisfaction cannot be questioned. *Id.* at 314. However, the party's dissatisfaction cannot be given in bad faith, dishonestly, insincerely, or fraudulently. *Id.* Where the contract is of the latter type, the party's dissatisfaction must be both genuine and reasonable. *Id.* at 313; *Cacavas v Zack,* 43 Mich App 222, 226; 203 NW2d 913 (1972).

> The trial court construed the supply agreement as being the former type:

>> The right to make the determination in this case, which the parties agreed, rested with JCI. The satisfaction rested with JCI because the contract was of the first type where the "individual judgement [sic]" of the party was agreed by JCI and Atlantic to be in the "sole discretion" of JCI. There is no evidence the parties bargained for or agreed to any other standard so the contract would fall under the second type of satisfaction contract. See *Isbell*, *supra* at 312, 313; *Leighton v Leighton*, 10 Mich App 424 (1968); *Nohcra Communications, Inc v AM Communications, Inc*, 909 F2d 1007 (1990), citing *Jenkins Towel Service, Inc v Tidewater Oil Co*, 427 Pa 601 (1966).

The trial court's construction of the agreement is consistent with the plain and unambiguous language of the agreement.[10]

> We reject defendant's assertion that the supply agreement created a requirements contract. A requirements contract is one in which "the quantity term is not fixed at the time of contracting [and t]he parties agree that the quantity will be the buyer's needs or requirements of a specific commodity or service" over the life of the contract. Corbin, Contracts (rev ed), § 6.5, p 240. Under a requirements contract, the parties are expected to act in good faith and according to commercial standards of fair dealing in the trade. *Gen Motors Corp v Paramount Metal Products Co,* 90 F Supp 2d 861, 873 (ED Mich, 2000). A party may be subject to liability for breach of contract if it acts in bad faith or seeks to unilaterally terminate purchase orders. *Id.*

> Here, JCI agreed to purchase its production and service requirements for the P356 program from defendant, but the parties also agreed that JCI could resource the production of the parts if JCI did not have continuing satisfaction with Atlantic's quality, delivery, meeting of program milestones, service and price-competitiveness. Under these circumstances, the trial court properly determined that the contract was a satisfaction contract and not a requirements contract.

---

[10] Thus, JCI's asserted dissatisfaction must have been made in good faith. *Isbell*, *supra* at 314. The issue of good faith is discussed in Issue III.

## B. THE CHRYSLER LC-22 PROGRAM AGREEMENT

Defendant argues that the trial court erred by granting summary disposition of defendant's claims relating to termination of the Chrysler LC-22 program supply agreement in favor of JCI on the ground that the Chrysler supply agreement expressly allowed JCI to terminate the agreement without cause. We disagree.

JCI and defendant entered into a supply agreement relating to the Chrysler LC-22 program pursuant to which JCI agreed to purchase its production and service requirements for certain components of that program from defendant, subject to various terms and conditions and rights of termination. The supply agreement set forth a number of circumstances under which JCI was authorized to terminate or cancel the agreement. The agreement also provided that the specific circumstances permitting JCI to terminate the agreement that were set forth in the agreement were "in addition to and without limiting any other right of termination Johnson Controls has under its purchase order or Global Terms and Conditions of Purchase." Thus, JCI incorporated all of its termination rights under the terms and conditions into the supply agreement.

Section 20 of the terms and conditions provided:

Termination. In addition to any other rights of Buyer to cancel or terminate the Order, Buyer may, at its option and in its sole discretion, terminate all or part of the Order . . . at any time and for any reason, and notwithstanding the existence of any event of force majeure under Section 22, by giving at least 14 days written notice . . .

JCI exercised its contractual right to terminate the outstanding purchase orders issued to defendant relating to the Chrysler LC-22 program for convenience, effective May 9, 2009. The plain and unambiguous terms and conditions of purchase gave JCI the absolute discretion to terminate the purchase order without cause with 14 days' notice. *Burkhardt v Bailey*, 260 Mich App 636, 656; 680 NW2d 453 (2004). Defendant's argument that termination under the terms and conditions of purchase would not affect the grounds for termination in the supply agreement fails to consider that JCI's termination rights under the supply agreement were "in addition to and without limiting any other right of termination" JCI had under the terms and conditions of purchase. If termination under the terms and conditions only affected a purchase order issued by JCI and did not affect defendant's rights under the supply agreement, the language, "in addition to and without limiting any other right of termination" would be unnecessary. In order to give effect to every word in the supply agreement, the words must be construed to mean that

defendant's right to continue to supply JCI with parts under the supply agreement was subject to JCI's rights of termination under the terms and conditions of purchase.[11]

## IV. GOOD FAITH

Defendant argues that the trial court erred by finding that JCI acted in good faith when it terminated the supply agreement. It contends that the trial court erred by finding that defendant breached the contract with JCI based on the quality of the parts it produced, the results of the audit, and the failure to disclose costs and fees as required by the agreement. We review for clear error a trial court's findings of fact in a bench trial. *Redmond v Van Buren Co*, 293 Mich App 344, 352; 819 NW2d 912 (2011).

Defendant's assertions that there was overwhelming evidence that defendant's quality met JCI's standards, and that JCI never told defendant that it was dissatisfied with defendant's quality until its May 4, 2009 letter to Atlantic terminating the supply agreement, are not supported by the testimony presented at trial. JCI presented substantial evidence to support the trial court's finding that defendant experienced quality problems throughout the duration of the parties' relationship and communicated with defendant regarding the quality issues. To the extent that defendant argues that JCI acted in bad faith in terminating the contract because there were no quality issues with defendant's products, this argument is not supported by the evidence.

The evidence also supported the trial court's finding that defendant's prices for its parts were not competitive and that JCI was not satisfied with its audit of defendant's processes. The trial court found that JCI's exercise of its discretion to terminate the P356 supply agreement was both genuine and objectively reasonable. While defendant purported to submit evidence that JCI's termination on quality and price-competitiveness was pretextual, the trial court's findings of fact and conclusions of law make clear that the trial court carefully considered the evidence and rejected it. The court found that Ford and JCI did not collude to eliminate defendant before the end of the P356 contract and that, although Ford suggested that JCI could insource production of the door substrates as one means of cutting costs across all of its Ford projects, JCI resisted insourcing production of the parts. The trial court's factual findings are not clearly erroneous.

---

[11] Additionally, the terms and conditions of purchase required two actions on the part of defendant in the event of termination under section 20 that are inconsistent with any continuing right to supply parts under the agreement. First, section 20 required defendant, upon a termination for convenience, to "upon Buyer's request, cooperate with Buyer in transferring the production of Supplies to a different supplier, ..." Second, section 21 required defendant "when requested by Buyer, [to] return to Buyer all Buyer's property in as good condition as when received by Seller (reasonable wear and tear excepted)." Under the terms and conditions, "Buyer's Property" includes tooling used by defendant to manufacture the parts at issue." Thus, the distinction between termination of the supply agreement and termination of an order is meaningless.

## V. DEFENDANT'S MOTION FOR SUMMARY DISPOSITION

Defendant argues that the trial court erred by denying defendant's motion for summary disposition of JCI's breach of contract claim that was based on defendant's refusal to turn the tools over to JCI. We review de novo a trial court's decision regarding a motion for summary disposition. *Lavigne v Forshee*, 307 Mich App 530, 535; 861 NW2d 635 (2014).

Defendant maintained that it was entitled to summary disposition because defendant had a right to retain the tools under the molder's lien act, MCL 445.618, and that it turned over the tools after the court entered an order requiring JCI to pay the amount due for completed parts as a condition precedent to JCI's right to possess the tools. Defendant asserted that it could not be in breach of contract because the tools had been turned over to JCI after JCI complied with the court's order. The trial court rejected defendant's contention, finding that the interim order was not a ruling on the merits of defendant's refusal to return the tools and that a question of fact existed for trial.

Defendant then raised an alternate ground for its motion and asserted that the tools did not belong to JCI but, rather, to Ford, and JCI did not get permission from Ford to remove the tools before asking defendant to turn over the tools. Defendant acknowledged that it had not previously raised this argument. The trial court stated:

> Well, that's a question of fact. That's not a ruling of law that I can make. So you can preserve that for trial or subsequent motion. But – because I can't make a finding that – I can't make a – that's not a basis upon which I can make a resolution in a motion without something more. So you can always bring that again. But here's the point; is that the matter having been litigated before Judge Torres was limited to the exchange of the tools and the payment of money together with the posting of the bond. Whether the – what Visteon had with Ford, whether that was expanded or contracted or amend[ed] when Ford gave it to Johnson Controls is not something that I'm at this moment privy to. . . . And that's a question – that's fact that I can't resolve now.

Defendant than acknowledged that Ford did provide the approval after the hearing, but asserted that up until that time, "This is Ford's property and they [JCI] didn't even have Ford's approval to move it." JCI asserted that "if he wants to say Ford didn't authorize us to take the tools then – I deny that and it's an issue of fact." The trial court concluded:

> What I already told you is Ford may own the property. But what right is bestowed upon JCI when it entered into its contract with JCI [sic: Ford] removing or eliminating Visteon . . . is the question. And if that is a question, that should have been raised before Judge Torres at the time Torres ordered the tools conveyed to JCI is my point. And that wasn't – and that's what I asked you. You said, well that doesn't matter. Well it doesn't matter because you weren't there and you don't know if it was raised or not. And that would have been the point to say, you're asking us to return tools to JCI and they have no right to them would

-11-

have been a valid matter to raise in that hearing, because they were seeking the tools pursuant to the complaint.

Now you can't say, wait a minute, the whole cause of action is eliminated because they don't own them, Ford does. Well I don't know who owns them. But the question isn't who owns them, the question is who had the right to have them. And that's implicitly decided in Torres's order. JCI has got the right to them because he ordered the return of them to JCI. If that's improper that should have been appealed for reconsideration. . . .

So my point is, now you're saying well his cause of being [sic] should be eliminated because they don't own it or they haven't put it in a contract. And I'm saying you can argue that at trial, but for a motion I can't make a resolution of that fact.

So that's my ruling, that there is – as a matter of law I am unable to grant the defendant's motion. Not depriving defendant of the right to litigate it, but only I can't give him judgment on it because of that reason.

The trial court properly found that an issue of fact existed that prevented the granting of summary disposition.[12]

## VI. EXCLUSION OF EXPERT TESTIMONY

Defendant argues that the trial court's exclusion of defendant's expert testimony was an abuse of discretion because the expert would have testified that that JCI's failure to engage in any "escalation" process with respect to the quality of defendant's parts showed that defendant's quality was satisfactory and, therefore, would provide support for defendant's theory that JCI's reasons for terminating the supply agreement were pretextual. This Court reviews a trial court's ruling admitting or excluding expert testimony for an abuse of discretion. *Mulholland v DEC Int'l Corp*, 432 Mich 395, 402; 443 NW2d 340 (1989).

MRE 702, which governs the admission of expert testimony, provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the

---

[12] In this issue, defendant raises a number of arguments that are related to the trial court's post-trial findings. Defendant did not separately identify these arguments as a question presented. See MCR 7.215(C)(5). A party's failure to properly identify an issue in the statement of questions presented waives the issue for appellate review. *Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 337 n 3; 802 NW2d 353 (2010). Although we decline to address the issues, we note that we have reviewed each of the arguments and find them to be without merit.

-12-

testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 requires that the witness be an expert, that there be facts in evidence that require or are subject to examination and analysis by a competent expert, and the knowledge sought from the expert is "in a particular area that belongs more to an expert than to the common man." *Surman v Surman,* 277 Mich App 287, 308; 745 NW2d 802 (2007)

The gist of the expert's opinion was that JCI's failure to implement an industry-standard escalation process with respect to defects in defendant's products established that JCI did not terminate the P356 program supply agreement due to quality issues with defendant's products. The expert's opinion, however, did not rely upon the written contract governing the parties' relationship and, admittedly, the expert did not review the contract. Defendant conceded that the contract did not require JCI to provide defendant with an opportunity to cure. Thus, the trial court properly determined that the expert's testimony would not assist the trier of fact to understand the evidence or determine a fact in issue.

Under MRE 103(a)(1), error may not be predicated on a ruling admitting or excluding evidence unless a substantial right is affected. Even assuming that the trial court erred by excluding the expert's testimony, any error would be harmless as defendant presented evidence regarding the steps in the escalation process in the industry, as well as testimony that JCI did not implement all of the steps in the escalation process before terminating the contract.[13]

Affirmed. Plaintiffs, being the prevailing party, may tax costs pursuant to MCR 7.219.

/s/ Stephen L. Borrello
/s/ Kathleen Jansen
/s/ Donald S. Owens

---

[13] The testimony established, however, that defendant itself implemented the highest of the steps in the escalation process, which included 100% dock audits and third-party containment.